UNITED STATES of America,
Plaintiff-Appellee,

v.

Paul COTTON, Efrain Madrid, and
Carlos Fernando Pereira,
Defendants-Appellants.

No. 84–8513.

United States Court of Appeals,
Eleventh Circuit.

Sept. 6, 1985.

Bobby Lee Cook, Summerville, Ga., and Rikki J. Klieman, Friedman & Atherton, Boston, Mass., for Cotton.

Victor Hawk, Augusta, Ga., and Harvey Rogers, Miami, Fla., for Madrid.

Richard Hersch and Oscar Arroyave, Miami, Fla., for Pereira.

William H. McAbee II, Asst. U.S. Atty., Savannah, Ga., for plaintiff-appellee.

Before KRAVITCH, CLARK and PECK*, Circuit Judges.

CLARK, Circuit Judge:

Appellants Paul Cotton, Efrain Madrid, and Carlos Pereira appeal their convictions stemming from a conspiracy to import and distribute cocaine. Appellant Cotton was found guilty of Counts Two and Four of a four-count indictment, charging importation, aiding and abetting, and conspiracy to import cocaine. Appellant Pereira was found guilty of Counts One and Three, charging possession with intent to distribute, aiding and abetting, and conspiracy to distribute cocaine. Appellant Madrid was also found guilty of the offenses alleged in Counts One and Three.[1]

Appellants challenge their convictions on several grounds, asserting insufficient evidence, defective jury instructions, search and seizure violations, prosecutorial misconduct, Jencks Act/Brady violations, mis-

---

* Honorable John W. Peck, U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

1. Four other defendants were involved in the proceedings below, but are not before this court on appeal. Defendant Ginoris was charged in all counts and entered a guilty plea pursuant to a plea bargain to Counts One and Two. Co-defendant Bravo entered a guilty plea pursuant to a plea agreement to Count One. Co-defendant Bowen was severed the weekend before the trial began because of health reasons. Co-defendant Lopez was dismissed by the government from the indictment prior to trial.

joinder, and improperly admitted evidence. We affirm the convictions on all counts.

### FACTS

In early 1983, co-defendant Lopez purchased a Piper Navaho aircraft for 10,000 ounces of silver bar from a Texas broker. The bill of sale was made out to the Union Square Investment Corporation and the plane at the time of purchase was equipped with a "Panther conversion kit," which increases the horsepower and fuel capacity of the aircraft. Appellant Cotton accompanied Lopez on this trip to evaluate the plane and serve as a pilot.

During 1983, pursuant to information received from an informant, the government began surveillance of the plane to determine if it was being used in drug smuggling activities. From October 1983, to the end of February 1984, the plane sat idle at the Sylvania (Plantation Air Park) airport. The record shows that law enforcement personnel maintained surveillance of the aircraft, either directly or through an informant. Larry Sapp, a U.S. Customs Parole Officer, testified that this suspicious aircraft, was at Plantation Air Park from October 13, 1983, through the period of activities charged in the indictment, February 27 to March 2, 1984.

Tony Dugger, an employee at Plantation Air Park, testified that he did maintenance work on the plane while it was stored there. An airport work order for repairs and maintenance was also introduced at trial and was directed to Union Square Investment Corporation and bore the name "Paul." Dugger named Cotton as one of two men who put an antenna on the plane a few weeks before the events alleged in the indictment.

Appellant Cotton was observed in Savannah, Georgia from February 28 through March 2, 1984. He was seen in the company of defendants Lopez, Bravo, and Ginoris, initially at the Heart of Savannah/Quality Inn Motel and later at the Howard Johnson Motel on West Boundary Street in Savannah. Lopez rented Room 128 at the Quality Inn and it was placed under surveillance on February 28, 1984, until he checked out of the room on March 1, 1984.

Michael Dull, Special Agent for the Georgia Bureau of Investigation, first observed Cotton at the Heart of Savannah Motel between 6:20 and 6:36 P.M. on Tuesday, February 28. Dull's surveillance showed that Pablo Bravo first entered Room 128 and that Cotton entered later that evening. Dull identified two others who later entered the room as Mario Ginoris and the "unidentified Latin male" who flew on the plane but did not return to Georgia.

Ed Hope, a Georgia Bureau of Investigation Narcotics Agent, also conducted surveillance of Room 128. He saw a Buick arrive in the parking area at 2:25 A.M. on February 29. Hope observed Bravo and Ginoris put ice in the cooler in the trunk. Bravo parked the Buick and removed a white K-car Dodge Aries from its space. Bravo and Ginoris transferred items from the Buick to the Dodge. Hope saw Cotton and the unidentified male leave Room 128 and approach the Dodge with luggage. Cotton walked to the Buick trunk and removed plywood covered with cellophane, which Hope characterized as a "chart board" and placed it in the Dodge. Cotton left in the Dodge with Bravo, Ginoris and the "unidentified Latin male" at approximately 2:40 A.M.

James Burch, of the Georgia Bureau of Investigation, and Dennis Craig, of the Drug Enforcement Administration, both conducted surveillance at the Plantation Air Park early on February 29. Burch used binoculars, and Craig used a zoom camera from inside a nearby aircraft. Sometime between 3:45 and 3:55 A.M., a white vehicle arrived with Cotton, Bravo, Ginoris and the "unidentified Latin male." All four took items out of the car and placed them in the terminal. The agents then observed Cotton and the other three men push the Lopez aircraft from the hangar to the gas pump, where they proceeded to fill the aircraft with fuel. Cotton was also seen carrying two fuel containers from the hangar to the plane.

The pilot, defendant Russell Bowen, arrived at the Plantation Air Park at 4:45 A.M. Cotton and Bowen conversed in the hangar and Bowen removed a paper from a brown tote bag and showed it to Cotton.

Agent Burch testified that an unidentified person then made a phone call. Bravo placed two apparently full gas cans on a dolly and took them back to a second hangar. Two "Latins" then removed luggage and a cooler from the plane and placed them in the Dodge. Agent Craig testified that Cotton helped them in moving the luggage. Between 5:45 and 6:00 A.M., Cotton, Ginoris, Bravo and the unidentified male left in the Dodge. Approximately 85 minutes later, the white Dodge reappeared at the Quality Inn and the four individuals in the car went back to their rooms.

During the next day Cotton, Bravo, Ginoris, two others and Lopez, the owner of the plane, were observed at the motel. At 1:45 A.M. on March 1, Agent Dull saw Cotton, Bravo and two short males leave the Heart of Savannah lot in the white Dodge. Agent Sapp saw a white car arrive at the Plantation Air Park at 3:40 A.M. Five males went from the car to the office. Agent Sapp stated that Cotton did not come out to the airplane but stayed on the sidewalk in front of the office, apparently overseeing the preparations for departure. Shortly thereafter, at approximately 4:00 A.M., the plane took off with pilot Bowen and two male passengers. Cotton and Bravo then left the airport and returned to the Heart of Savannah hotel shortly after 5:00 A.M. Agent Dull testified that Cotton and Bravo left the motel with Lopez on Thursday afternoon, March 1, and traveled in two cars to the Howard Johnson Motel. The three used Room 115, and Lopez and Bravo used outside pay telephones at 8:40 P.M.

On Friday, March 2, Lopez left and returned to the motel with Cotton in the white Dodge. Bravo had arrived earlier in a taxi. Agent Dull saw Cotton several times that afternoon. At 3:00 P.M. Agent Dull saw Lopez speaking with two people in a black Toyota truck with an attached trailer in the parking lot. At 6:15 P.M. Cotton and Lopez departed by cab.

On that same day defendant Bravo and appellants Madrid and Pereira went to the Taylor Furniture Store in Savannah where Bravo purchased two mattresses, two box springs and a set of cookware. Bravo paid for the merchandise in cash from a large roll of bills that he had in his pocket. Also that day, appellant Pereira registered at the Mulberry Inn Motel on Bay Street in Savannah, and was observed driving a black Toyota pickup truck towing a U-Haul trailer. The Toyota was registered under Pereira's name. Persons fitting the descriptions of Madrid and Pereira were seen in and out of Room 128 at the Quality Inn and later at the Howard Johnson Motel. A gray Buick and a black Toyota truck arrived at the Plantation Air Park late in the afternoon of March 2. The Toyota truck was driven by Pereira and inside the truck was Madrid. Pablo Bravo had arrived in the gray Buick. The truck was pulling an open trailer without a top and had three or four mattresses in it when it arrived. Between 6:00 and 6:30 P.M., upon hearing an aircraft approach the airfield, Pereira, Madrid, and Bravo were observed jumping up and down and hugging each other. Pilot Bowen and defendant Ginoris were in the plane. Once the plane came to a stop, Ginoris exited and greeted Bravo, Pereira and Madrid. Ginoris, Pereira, Bravo, and Madrid then began to unload the duffle bags, later found to contain cocaine, from the plane into the U-Haul trailer. Shortly thereafter government agents converged on the scene and arrested Bowen, Ginoris, Bravo, Pereira and Madrid. Defendant Lopez and appellant Cotton were arrested at the Savannah Airport as they waited to board a flight to Miami, Florida.

## DISCUSSION

### Sufficiency of the Evidence

All three appellants challenge their convictions, claiming a lack of sufficient evidence to convict. Appellants principally claim that no more than mere presence was shown and that the government piled infer-

ence upon inference in proving its case without clearly proving each link in the inferential chain.

In reviewing the sufficiency of the evidence, this court must sustain the convictions if the evidence, when viewed in the light most favorable to the government, is such that a reasonable jury could find guilt beyond a reasonable doubt. *See United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638, (1983). To sustain a conviction in a federal drug conspiracy case the government bears the burden of proving beyond a reasonable doubt that a conspiracy existed, that the defendant knew of it, and voluntarily joined in it. *United States v. Lippner*, 676 F.2d 456, 466 (11th Cir.1982). With regard to intent, the government must prove beyond a reasonable doubt that the defendant had a deliberate, knowing, and specific intent to join the conspiracy. *United States v. DeSimone*, 660 F.2d 532, 537 (5th Cir. Unit B 1981), *cert. denied*, 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982). While circumstantial evidence may be used in proving a conspiracy, more than mere presence at the scene of the crime must be shown. *United States v. Pintado*, 715 F.2d 1501, 1504 (11th Cir.1983). Moreover, in proving the existence of a conspiracy through circumstantial evidence, each link in the inferential chain must be clearly proven. *United States v. Galvan*, 693 F.2d 417, 419 (5th Cir.1982).

### Appellant Cotton

The evidence of Cotton's participation in the conspiracy was substantial and supported the jury's finding of guilt. First, Cotton was closely connected with the aircraft used to illegally import cocaine. Cotton served as a pilot for Lopez, the purchaser of the airplane, and later installed an antenna on the plane at the Plantation Air Park. Moreover, there was a work order slip for maintenance and repairs that had the name "Paul" written on it.

Cotton was seen several times on February 28 through March 1, 1984, at the Heart of Savannah Motel with co-conspirators Lopez, Bravo and Ginoris. Most importantly, on two consecutive nights, February 29 and March 1, 1984, Cotton was observed at the Plantation Air Park in the early morning hours, helping make preparations for the plane's departure. Government agents testified that Cotton appeared to be acting in a supervisory capacity as the co-defendants made preparations for the plane's departure. Moreover, the defendant was seen conferring with pilot Bowen who flew the aircraft on its illegal drug run.

In challenging the sufficiency of the evidence, Cotton points out that defendant Lopez was dismissed by the government before trial after a ruling by the court on a motion to suppress evidence seized at the time of Lopez's arrest. The court had stated that there was insufficient probable cause even to arrest him. Cotton points out that Lopez was seen doing everything that Cotton was, except for the two late night visits to the Plantation Air Park on February 29 and March 1. However, we find that Cotton's presence at the Plantation Air Park, late at night on February 29 and March 1 establishes conclusively Cotton's knowing participation in the conspiracy. More than mere presence was shown. Cotton was seen talking to and helping the other co-conspirators in preparations for departure and was observed acting in a supervisory capacity. Immediately after the preparations for departure on March 1, the plane left the Plantation Air Park piloted by co-conspirator Bowen. The plane returned approximately a day and a half later to the same airport, ladened with cocaine, and with pilot Bowen and co-conspirator Ginoris aboard. Co-conspirator Bravo, with whom appellant Cotton had been seen with on numerous occasions, was awaiting the aircraft at the Plantation Air Park. Given Cotton's extensive contact with the other co-conspirators and the surreptitious nature of the late night preparations of the aircraft prior to his departure, we conclude that the government established the necessary inferential chain, and that based upon

the circumstantial evidence a reasonable jury could have inferred guilt beyond a reasonable doubt.

We particularly note that this case can be differentiated from *United States v. Kelly*, 749 F.2d 1541 (11th Cir.1985); *United States v. Galvan*, 693 F.2d 417 (5th Cir.1982); *United States v. DeSimone*, 660 F.2d 532 (5th Cir. Unit B 1981), *cert. denied*, 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982). In all three cases the defendants whose convictions were overturned had only isolated contacts with the other co-conspirators prior to the illegal transaction, and more importantly had not been conclusively linked to the instrumentalities of the conspiracy. In this case, appellant Cotton was observed in the presence of the co-conspirators over a number of days and most importantly, was intimately connected and involved with the primary instrumentality in the conspiracy, the airplane. Cotton's mere presence argument defies logic. The evidence supports the finding that Cotton knowingly and willingly participated in the drug importation conspiracy.

### Appellants Pereira and Madrid

■ Appellants Pereira and Madrid make the same mere presence argument as appellant Cotton. However, their mere presence argument is incredulous, as they were caught red-handed unloading the cocaine from the airplane at the Plantation Air Park. Appellants claim that they did not know that they were unloading cocaine, but had been hired to unload Guatamalian relief supplies. In support of this claim, appellants point out that the cocaine was packaged in airtight and waterproof containers and it was impossible for them to know the true contents of the packages.

However, the jury was entitled to disbelieve this implausible story based upon the other circumstantial evidence presented against the defendants. For instance, the defendants were seen in the presence and apparently directed by co-conspirator Bravo, who was intimately involved with the other co-conspirators and had been present at the Plantation Air Park in the early morning hours of February 29 and March 1. Bravo, Madrid and Pereira were awaiting the arrival of the aircraft at the Plantation Air Park on March 2 and appeared elated and gleeful when the aircraft was sighted. Madrid and Pereira were greeted by co-conspirator Ginoris when he deplaned from the aircraft upon landing. Moreover, Pereira's claim that he had agreed to unload the supposed Guatamalian relief supplies to make a little money on his way to Philadelphia was belied by the fact that he had almost $1,300 in cash in his pocket upon arrest. When a defendant takes the stand in a criminal case, he subjects himself to a determination by the jury of his credibility. The jury is free to disbelieve him and reject his explanation as complete fabrication. Apparently the jury did exactly that. Since the participation of Madrid and Pereira in the conspiracy could have reasonably been inferred from the presence of the defendants at the airport in conjunction with all the circumstances surrounding that presence, we find that a reasonable jury could have found guilt beyond a reasonable doubt.

### JURY INSTRUCTIONS

The appellants allege the following errors concerning the jury instructions given by the court: (1) that the instructions on knowledge and specific intent were inadequate and defective; (2) that the instruction on intent was burden shifting and that the court's refusal to give requested instructions tailored to their case was error; (3) that the underlining of certain words in the written charge given to the jury constituted error.

■ Although a defendant is entitled to have the jury instructed on the law concerning his defense theory, it is well settled that a defendant has no right to insist on the particular phrasing of the instruction. *United States v. Snowden*, 735 F.2d 1310, 1315 (11th Cir.1984); *United States v. Middleton*, 690 F.2d 820, 826 (11th Cir.1982), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1497, 75 L.Ed.2d 929 (1983). The jury instructions given adequately presented the de-

fendants' defense theory, which was essentially one of mere presence. In fact, counsel for defendant Cotton read one of the key instructions to the jury in his argument. The instructions given by the trial court on mere presence have previously been approved by this court. *See United States v. Snowden,* 735 F.2d 1310, 1315 (11th Cir.1984).[2]

■ Appellants next urge that the court's instructions on intent unconstitutionally shifted the burden of proof. The instruction at issue read:

Ordinarily, intent may not be proved directly. There is no way to fathom, divine, or scrutinize the operations of the human mind. You may infer the defendant's intent from the surrounding circumstances. You may consider any statement made, act done, or omission by the defendant, and all other facts and circumstances in evidence which indicate his state of mind.

You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. As I have said, it is entirely up to you to decide what facts to find from the evidence.

Appellants argue that even though the modifier "may" was used, this was insufficient to remove the possibility that it was susceptible to being considered by the jury as a conclusive presumption or as shifting the burden of persuasion. Appellants rely upon *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), as controlling and argue that the Court's rationale in *Sandstrom* is applicable to this case and mandates reversal. In *Sandstrom* the Supreme Court invalidated a charge that stated: "[t]he law presumes that a person intends the ordinary consequences of his acts." *Sandstrom,* 442 U.S. at 513, 99 S.Ct. at 2453.

This court has previously dealt with an instruction similar to the one given in this case and found its permissive language to be acceptable under *Sandstrom.* In *Lamb v. Jernigan,* 683 F.2d 1332 (11th Cir.1982), *cert. denied,* 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983), we stated:

[T]he *"may* be presumed" language used here was unlikely to be interpreted by reasonable jurors as *requiring* them to draw an inference of intent.... The permissive language would also tend to prevent reasonable jurors from viewing the presumption, once made, as conclusive or irrebuttable. Having been told that they *might* infer intent from certain types of evidence, reasonable jurors would not likely conclude they were entitled to do so in the face of convincing contradictory evidence. (citations and footnote omitted) (emphasis in original).

*Id.* at 1340. Accordingly, we conclude that this instruction was not reasonably susceptible to an interpretation that would relieve the prosecution of its burden of proving intent beyond a reasonable doubt, or would otherwise undermine the fact-finding responsibilities of the jury.

■ Appellants argue that the underlining of words like "not," "or," "nor," "all," or "were" in the jury instructions had the potential of causing jurors to think that the government had to show little to get a conviction. Cotton cites *United States v. Simms,* 508 F.Supp. 1188 (W.D.La.1980), in support of this argument. We find the reasoning of *Simms* to be inapplicable to the facts of this case and find that the objections to the underlining is meritless as no prejudice can be shown.

## FAILURE TO SUPPRESS THE BEEPER SEARCH

■ Appellants argue that the trial court erroneously denied its motion to suppress items seized from the aircraft as a result of the illegal installation and mainte-

---

**2.** The judge instructed the jury that: "Of course, mere presence at the scene of an alleged transaction or event, or mere similarity of conduct among various persons and the fact that they may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy."

nance of a transponder. Appellants' argument is meritless and can be disposed of in short order. First, the Supreme Court held in *United States v. Knotts*, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), that a warrantless monitoring by a transponder does not violate the Fourth Amendment when it reveals information that could have also been obtained through visual surveillance, stating:

> The fact that the officers in this case relied not only on visual surveillance, but on the use of the beeper to signal the presence of Petschen's automobile to the police receiver, does not alter the situation. Nothing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case.

103 S.Ct. at 1086. Moreover, the Court stated:

> A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another. When Petschen travelled over the public streets he voluntarily conveyed to anyone who wanted to look the fact that he was traveling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property.

103 S.Ct. at 1085.

Likewise, no expectation of privacy in the movements of the aircraft attached as it traveled through the public air space. Additionally, as noted by the district court: "Although the record suggests that the transponder signal data was transmitted to the Customs pilot before he detected Lopez's plane on his own radar, there is little to suggest that his ultimate 'fix' on the plane two minutes later would not have occurred in the absence of the beeper data, since ground *radar* was still tracking it and continued to do so simultaneously with the transponder signal." Thus, notwithstanding the conclusive rationale of *Knotts*, the tracking of the aircraft by radar provided an independent source for its location and therefore would excuse the claimed illegal search through the independent source doctrine. *See Nix v. Williams*, —— U.S. ——, ——, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984); *United States v. Bailey*, 691 F.2d 1009, 1013 (11th Cir.1982), *cert. denied*, 461 U.S. 933, 103 S.Ct. 2098, 77 L.Ed.2d 306 (1983).

## PROSECUTORIAL MISCONDUCT

In rebuttal to the defendants' closing argument, the prosecutor made the following statement:

> May it please the court, Mr. McAbee, and Counsel, ladies and gentlemen, we have heard here today about Scotsdale and Marietta, and Iwo Jima, and various other places. And I have not been around all that long. I'm a young man, and I've only been practicing for three years; not really quite three years. And I can tell you, and I will submit that any young man my age in the United States of America can tell you of the destruction of this stuff.
>
> I cannot tell you about Scotsdale. I cannot tell you about Iwo Jima. I can't tell you about Marietta. But, people such as myself, you people in this country have gone to school the next day and found people missing, have gone through their entire lives where people lose their freedom due to this substance. They lose it in various ways. They lose their lives actually. They become addicted. They go to jail.
>
> We are talking here about this stuff, this garbage as Mr. McAbee called it.
>
> Ladies and gentlemen of the jury, this is cocaine. And what we have here, and what you are here to decide involves the greatest quantity of cocaine this area of the country has ever seen before. We're talking about 708 pounds in the wrapper, and 500 and something pounds when it's placed on a scale all by itself, raw powder. We're not talking about Scotsdale. We're not talking about Marietta. We're talking about the smuggling of cocaine

into the continental United States for distribution throughout the country. That's what we're talking about.

Upon objection by defense counsel, the court immediately issued a curative instruction stating:

All right. It is not the inherent vice of cocaine. The law proscribes it, says that it is contraband, and it is wrong to import it, and the fact that it is offensive, that is enough. It has been set aside by the law as being contraband. But, the question is whether, under the law that I will charge you, is whether or not these defendants have committed a violation, and that fact is proved by the government beyond a reasonable doubt.

The court gave an additional instruction at the end of the day before the jury retired to abide by previous instructions and finally in the court's overall charge to the jury the court again instructed the jury on the weight to be given arguments of counsel.

In assessing appellants' contention that the prosecutor's improper remarks amounted to Constitutional error requiring reversal, we are guided by *United States v. Butera*, 677 F.2d 1376 (11th Cir.), *cert. denied*, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983). In *Butera* our court stated:

We need not speculate whether the comments in this case may be justified as proper rebuttal of the entrapment defense, or whether the prosecutor intended to make a statement urging a conclusion permissibly inferable from the evidence. *Cf. United States v. Morris*, 568 F.2d 396, 402 (5th Cir.1978). Prosecutorial misconduct alone does not require reversal unless the misconduct deprives the defendant of a fair trial. *See Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). The relevant question is whether a prosecutor's actions "prejudicially affected substantial rights of the defendant." *United States v. Dorr*, 636 F.2d 117, 120 (5th Cir.1981).

Prosecutorial misconduct can be considered harmless error where the district court gives an immediate curative instruction, and the evidence of the defendant's guilt is overwhelming. *See United States v. Mack*, 643 F.2d 1119, 1124 (5th Cir.1981); *United States v. Booher*, 641 F.2d 218, 221 (5th Cir.1981); *United States v. Georgalis*, 631 F.2d 1199, 1203–04 (5th Cir.1980); *United States v. Lichenstein*, 610 F.2d 1272, 1281–82, (5th Cir.), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980).

*Id.* at 1382–83.

We do not find the argument as egregious as defendants argue. Counsel was attempting to respond to defense counsel's emotional argument. Both arguments were totally irrelevant to guilt or innocence and cannot be said to have deprived the defendants of a fair trial. Nevertheless, we will address the issue further.

The first prong of the *Butera* has clearly been met in that the district court gave a curative instruction immediately after the prosecutor's remarks. In addressing the second prong of *Butera*, we must decide whether the evidence of the defendants' guilt is overwhelming. As to Madrid and Pereira we have no problem finding overwhelming evidence of guilt as they were caught red-handed unloading the cocaine from the aircraft. As to appellant Cotton, although he was not actually present at the off-loading of the cocaine-laden aircraft, the evidence establishing his connection with the importation scheme was overwhelming. His close connection with the primary instrumentality of the smuggling scheme, the airplane, is irrefutable. He was present during the purchase of the plane and was observed at the airport in the middle of the night on two consecutive nights helping make preparations for the plane's illegal drug run.

## JENCKS MATERIAL

 Appellants allege a Jencks Act/Brady violation because of the redacting of government agents' reports indicating the activities of government informant

Maierhoffer at the airport on Wednesday morning, February 29, 1984. The appellants also allege that the agents perjured themselves when testifying on this point at trial.

The appellants' contention essentially centers around how many persons moved the aircraft from the hangar on the morning of February 29. The surveillance agents testified concerning all of the defendants who moved the aircraft, but did not mention or name the informant who was also present. However, we find that the agents' omitted reference to the informant did not change the nature or quantity of the evidence concerning defendants' activities during this time period. Moreover, the informant's presence and activities at the airport eventually became known at trial. Once the identity of the informant was exposed at trial the information concerning his assistance in moving the aircraft was provided to the defense. The agents were then re-examined and stated they believed omitting references to the informant was in conformity with their obligation to withhold information concerning the informant and in accordance with the court's order. Once the informant's name was revealed, his activities concerning moving the aircraft were covered by re-cross examination.

In determining whether a conviction is fundamentally unfair because of alleged false testimony, there must be a finding of a reasonable likelihood that the testimony affected the judgment of the jury. *See United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The involvement of agent Maierhoffer had no connection to proof of the defendants' guilt. Moreover, appellants have failed to show how the failure of the agents to mention Maierhoffer would have affected the judgment of the jury. Finally, presenting the unredacted agent's report to the defense and the cross-examination of the agents which followed cured any possible violation concerning the Jencks Act or Brady principles.

We have reviewed appellants' other contentions on appeal and find them meritless.[3] Accordingly, judgment of the district court is AFFIRMED.

AFFIRMED.

**3.** These contentions were as follows:
(1) Conclusory statements of government agent concerning Cotton's "supervisory capacity" and admission of a work record from the airport were improperly admitted by the trial court;
(2) The lack of a common conspiracy count among the codefendants resulted in misjoinder;
(3) The indictment was impermissibly tainted because of allegedly false testimony presented before the grand jury.