United States Court of Appeals,

Fifth Circuit.

No. 91–6017.

UNITED STATES of America, Plaintiff–Appellant,

v.

Cesar Augusto RESTREPO and Luis Pulido, Defendants–Appellees.

July 21, 1992.

Appeal from the United States District Court for the Southern District of Texas.

Before JOHNSON, GARWOOD, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

This suppression of evidence case, implicating the independent source doctrine, arises from the warrantless "security sweep" of the residence of Defendant–Appellee Luis Pulido and the subsequent search of that same residence pursuant to warrant. Plaintiff–Appellant United States appeals the district court's decision to exclude from Pulido's trial all evidence from the second search as tainted by the initial, illegal sweep. The government insists that the proper approach is to excise from the warrant affidavit those facts that were gleaned from the illegal search, and then to consider whether the affidavit's remaining information is sufficient to constitute probable cause. Agreeing with the government that this is the correct methodology, we determine as a matter of law that the warrant affidavit, purged of information gained through the initial search, nevertheless contains sufficient remaining facts to constitute probable cause for the issuance of the search warrant. Additionally, however, we conclude that *Murray v. U.S.*,[1] requires the district court to determine—independent of our determination that the expurgated warrant affidavit provided probable cause for the issuance of the warrant by the magistrate judge—whether the illegal search *affected* or *motivated* the officers' decision to procure the search warrant. Because the district court did not undertake this required analysis, we remand to that court for the appropriate findings of fact and conclusions of law. Lastly, as to Defendant–Appellee Cesar Augusto Restrepo, we ask the district court to consider again its

[1] 487 U.S. 2529, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

decision to exclude under Federal Rule of Evidence 403 evidence from the search of Pulido's residence.

## I. FACTS AND PROCEEDINGS

### A. SURVEILLANCE AND SECURITY SWEEP

On July 2, 1991, Customs Officer John Wooley received a confidential tip that narcotics trafficking was being conducted at a residence at 8996 Imogene, Houston, Texas (Imogene). Later that day, Wooley and other officers established surveillance on Imogene. A resident of the neighborhood, who somehow perceived that surveillance was being conducted, told one of the participating officers that many different cars arrived at Imogene, pulled into the garage, and then departed—a pattern, the government informs us, typical of drug trafficking.

Wooley obtained information from Houston Light & Power (HL & P) that electric service had been established at Imogene on January 14, 1991, were listed to Luz Irene Pina (Pina), and named Sally Flores (Flores) as a reference. Wooley discovered that Pina had also established electric service at a residence at 7254 Regency Square Court, Houston (Regency), on June 14, 1991. Flores was listed as a reference at Regency.

On the morning of July 3, 1991, officers established surveillance on Regency, and resumed it on Imogene. At about 10:20 a.m., officers watched as Restrepo arrived at Regency in a blue Toyota and picked up Pulido. Officers followed the blue Toyota to a strip mall where they observed Pulido making and receiving calls on a public telephone. Wooley believed that Pulido was making calls to digital pagers and receiving responding calls from the possessors of the pagers, also a pattern of drug trafficking, according to the government.

Restrepo left with Pulido after about eighteen minutes. The officers followed them to another strip mall, at which Pulido once again made and received calls at a public telephone. On this

occasion, Pulido was observed with a large wallet and black ledger book in which he made notations. Restrepo and Pulido departed after about sixteen minutes.

Officers next followed the pair to a residence at 13901 Hollowgreen, Houston (Hollowgreen). After remaining inside Hollowgreen for a short time, Pulido and Restrepo departed at about 11:30 a.m., once again in the blue Toyota. Wooley reports that Restrepo drove the blue Toyota below the speed limit after leaving Hollowgreen, perhaps, speculates the government, in an attempt to expose surveillance. At this time, officers observed Pulido using a cellular telephone while riding in the car with Restrepo.

Officers followed Restrepo and Pulido to a Home Depot store. At this location, Pulido was once again observed making calls at a pay telephone. Restrepo, in the meantime, drove away in the blue Toyota, apparently to rent video tapes. Shortly after 12:30 p.m., he returned to the Home Depot store and picked up Pulido. Officers then followed the blue Toyota back to Regency, where Pulido was dro pped off. From there the officers followed Restrepo in the blue Toyota, terminating their surveillance on Regency.

Restrepo, shadowed by the surveillance team, went to a Dunkin' Donut shop. Two officers entered, informed Restrepo that they were conducting an investigation, and asked Restrepo if he would speak with them outside. Restrepo agreed. When officers asked where he lived, Restrepo responded that he lived in Queens, New York, but could not remember the exact address. Restrepo also stated that the blue Toyota had been loaned to him when he arrived in Houston, but when asked by whom, he could not recall.

Agent Wooley asked Restrepo about his connection with the man at Regency. Restrepo responded that he did not know him. When Restrepo was asked the name of the man at Regency, he responded "Enrique"; later, however, Restrepo stated that the man at Regency is named "Pedro."

Restrepo told the officers that he and the man from Regency went to the Home Depot store and no other locations. When officers told Restrepo that he and the other man (who they later learned was Pulido) had been observed at Hollowgreen, Restrepo stated that he did, in fact, go to Hollowgreen.

Wooley then asked Restrepo for permission to search the blue Toyota. After some initial reluctance, Restrepo consented. The officers' search produced the black ledger, previously seen with Pulido, and the wallet that contained $688.00 in small denominations. Entries in the ledger, Wooley reports, are consistent with narcotics transactions. A drug-sniffing dog "alerted" to the wallet, indicating, the government tells us, the odor of narcotics. Restrepo was arrested and taken to jail.

The officers thereupon returned to Regency "to interview Pulido." At that point, there had been a break of about fifteen minutes in the surveillance on Regency, the time it took the officers to follow, interrogate, and arrest Restrepo. A woman, later identified as Mayra Cata Garcia, answered the officers' knock. She was told by the officers that they had information that narcotics were being dealt from her residence. Garcia responded that she and her children were the only persons in the residence at that time. When asked, Garcia refused to permit the officers to search the residence, stating that she had arrived only six days earlier and was merely visiting.

Despite Garcia's unambiguous refusal to allow the search, the officers entered and searched, justifying their warrantless, consentless search as a "security sweep." Pulido was located upstairs, "hiding" in the bathroom of the master bedroom. According to the government, Pulido invited the officers to search the house at that time, but Agent Wooley declined. But according to Pulido, he did not consent to search. In any event, Pulido, Garcia, and the two children were detained in the living room for four hours while Wooley sought and obtained a search warrant. The officers did not consider that Pulido was under arrest during that period.

Immediately after leaving Regency, Wooley prepared an affidavit to support his application

for warrants to search Regency, Hollowgreen, and Imogene. Wooley's affidavit for the Regency warrant contained the following information: a description of his (Wooley's) experience with narcotics investigations; the confidential informant's tip about narcotics trafficking at Imogene; the neighbor's information about comings and goings at Imogene; the HL & P information linking Imogene (the suspected stash house) and Regency; the surveillance team's observations of Restrepo and Pulido; evidence seized from the blue Toyota; and information acquired as a result of the "security sweep" of Regency.

The portion of Wooley's affidavit containing information acquired as a result of the "security sweep" states:

> At 1:45 p.m., Agents went to 7254 Regency Square Court to talk with the occupants. At that address a Latin female answered the door. The Latin female identified herself as Mira [sic]. HPF Officer Garcia told Mira that he had developed information that narcotics trafficking was being conducted from the residence. Mira stated that she and her two children were the only persons at the residence. Officer Garcia asked Mira if she would consent to a search of the residence. Mira stated that she would not. Agents then conducted a security sweep of the residence to secure it until a search warrant could be obtained. In the upstairs master bedroom bath, Special Agent Wooley found Narvaez del Rio hiding.
>
> All occupants of the residence were moved to the living room area to ensure officer safety. Before leaving the residence to write the affidavit for the search warrant, Special Agent Wooley asked Narvaez del Rio his name. He answered Luis Pulido.[2]

Restrepo and Pulido were indicted for conspiracy to distribute cocaine and for aiding and abetting one another in that conspiracy.

## B. DISTRICT COURT'S RULING

The district court first found that the "security sweep" of Regency was unconstitutional; and the government does not contest that ruling before this court. Then, agreeing with Pulido, the district court ruled that all evidence seized from Regency pursuant to the search warrant must be suppressed

---

[2]At the time Wooley prepared the affidavit, he believed that Pulido was actually Narvaez del Rio. Apparently the officers discovered a "cedula" from the Republic of Columbia for Raphael Antonio Narvaez del Rio in the large wallet found in the blue Toyota.

because Wooley's search warrant affidavit contained information derived from the unconstitutional search. The district court based its decision on *Murray v. U.S.,* which held that a search pursuant to warrant is not an *independent source* of the evidence seized if the police officers' "decision to seek the warrant was prompted by what they had seen during the initial entry, *or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.*"[3] Because the government offered no evidence showing that the magistrate judge issuing the warrant in this case did not rely on "the entire affidavit in making the decision to sign the search warrant," the district court found that the search warrant could not constitute an independent source of the seized evidence.

The district court rejected the government's contention that, using the methodology endorsed in *Franks v. Delaware,*[4] for excising false statements, the court should excise the tainted information from Wooley's affidavit and then consider whether the remaining untainted information furnished probable cause. The district court believed that it was bound by *Murray's* command that the illegally-acquired information not affect the magistrate judge's decision. The district court also relied on our post-*Murray* decision in *U.S. v. Register,*[5] in declining the government's entreaty to apply the *Franks* procedure.

Finally, after determining that Restrepo lacked standing to challenge the search of Regency, the district court ruled that evidence from the Regency search was nevertheless inadmissible against Restrepo under Federal Rule of Evidence 403. The court gave no explanation of the factors involved in its balancing of unfair prejudice and probative value, merely stating that "the probative value of the evidence as to Restrepo is substantially outweighed by its prejudicial effect."

---

[3]108 S.Ct. at 2535–36 (emphasis added;  citations and footnote omitted).

[4]438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

[5]931 F.2d 308, 311 (5th Cir.1991).

## II. ANALYSIS

*A. THE FRANKS METHODOLOGY*

      This case concerns the independent source exception to the exclusionary rule. The independent source doctrine is based "upon the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied" had the misconduct not occurred.[6] Thus, even if police engage in unconstitutional activities—in this case, the initial entry and search of Regency in violation of the Fourth Amendment—evidence discovered during such illegal activities is nonetheless admissible if it is also discovered through an independent source.[7]

      In *Murray,* a four-three decision, the Supreme Court ruled that bags of marijuana seen by police during an illegal warrantless search of a warehouse could still be seized pursuant to a later-acquired search warrant if independent information supported that warrant. The search warrant affidavit in *Murray* neither mentioned the warrantless entry nor contained information obtained from that entry so the illegal search clearly did not affect the magistrate judge's decision to issue the warrant.[8] Writing for the plurality, Justice Scalia explained the contours of the independent source doctrine in such circumstances:

>       The ultimate question [ ] is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. *This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was*

---

[6]*Murray,* 108 S.Ct. at 2535.

[7]*See Segura v. U.S.,* 468 U.S. 796, 814, 104 S.Ct. 3380, 3390, 82 L.Ed.2d 599 (1984) (evidence admissible when search warrant issued solely on basis of information known before previous illegal entry and items were not seen during illegal search). *See also, e.g., Hamilton v. Nix,* 809 F.2d 463, 467–68 (8th Cir.1987) (testimonial evidence admissible when police lawfully learned of witness's involvement during an interrogation occurring before defendant's Fifth and Sixth Amendment rights were violated); *U.S. v. Cotton,* 770 F.2d 940, 947 (11th Cir.1985) (evidence admissible despite illegal use of beeper because ground radar provided independent source of plane's location).

[8]108 S.Ct. at 2536.

*presented to the Magistrate and affected his decision to issue the warrant....* The District Court found that the agents did not reveal their warrantless entry to the Magistrate, and that they did not include in their application for a warrant any recitation of their observations in the warehouse. It did not, however, explicitly find that the agents would have sought a warrant if they had not earlier entered the warehouse.[9]

The Court then ordered the case remanded to the district court for a determination whether the warrant-authorized search of the warehouse was *prompted* by the initial illegal search.

In the case now before us, the district court interpreted *Murray*'s phrase—"or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant"—as requiring the court to consider the *actual* effect of the illegally-acquired information in Officer Wooley's warrant affidavit on the decision of this *particular* magistrate judge to issue the warrant to search Regency. Although we acknowledge that the district court's interpretation is at least facially consistent with Justice Scalia's statement in *Murray,* we believe, for the reasons that follow, that the Supreme Court never intended this interpretation.

Prior to *Murray,* this and other circuits had adopted variations on the rule that evidence obtained in an illegal search is first excised from the warrant affidavit, after which the expurgated version is evaluated for probable cause.[10] This approach was simply the logical extension of the rule in *Franks* that warrant affidavits containing *false statements* are to be afforded this treatment. In *Antone,*[11] for example, the defendant moved to suppress all evidence seized from his residence pursuant to a search warrant on the grounds that the warrant affidavit contained information gained through a prior illegal search. On review of the district court's denial of the defendant's motion, we found, as per *Franks,* that the district court acted correctly in excising the tainted information from the warrant affidavit and then considering whether the redacted warrant was nevertheless based on

[9]*Id.* at 2535–36 (emphasis added; citations and footnote omitted).

[10]*See, e.g., U.S. v. Antone,* 753 F.2d 1301, 1307 (5th Cir.1985); *U.S. v. Veillette,* 778 F.2d 899, 903–04 (1st Cir.1985).

[11]753 F.2d at 1307.

probable cause. We concluded, as had the district court, that because the tainted information constituted only a small part of the information presented to the magistrate judge in support of the search warrant, the warrant was based on probable cause.[12]

Nothing in *Murray*—other than perhaps the unfortunate sentence fragment in dispute here—indicates that the Supreme Court intended to reject the prevailing *Franks*-inspired rules.[13] The relevant phrase ("affected his decision to issue the warrant"), almost certainly was simply a paraphrase—albeit a confusing one when considered noncontextually—of the approach long sanctioned in the circuits. The Third Circuit's recent decision in *U.S. v. Herrold,*[14] the only case we have found that even considers the interpretation of *Murray* espoused by Pulido, makes this point abundantly clear:

> [T]he Court's use of "affect" in *Murray* must be understood to signify affect in a substantive manner. Thus, the fact that an application for a warrant contains information obtained through an unlawful entry does not per force indicate that the improper information "affected" the justice's decision to issue the warrant and thereby vitiate the applicability of the independent source doctrine. Rather, if the application contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies, providing that the officers were not prompted to obtain the warrant by what they observed during the initial entry.[15]

In addition, we find no other post-*Murray* circuit cases concerning the independent source doctrine that have interpreted *Murray* as refuting their pre-*Murray* holdings that inclusion of illegally-acquired information on a warrant affidavit does not invalidate the warrant if the affidavit's other averments set forth probable cause.[16]

---

[12]*Id.*

[13]Of course, even had the plurality in *Murray* intended to question the established *Franks*-derived approach, its discussion of this point would constitute mere dictum given that tainted information was not even offered to the magistrate judge in that case.

[14]962 F.2d 1131 (3rd Cir.1992).

[15]*Id.* at 1141–1142.

[16]*See, e.g., U.S. v. Gillenwaters,* 890 F.2d 679, 681–82 and n. 4 (4th Cir.1989); *U.S. v. Johnston,* 876 F.2d 589, 592 (7th Cir.1989). *Cf. U.S. v. Walker,* 931 F.2d 631, 633 (10th

Finally, contrary to Pulido's assertion, our post-*Murray* decision in *Register* does not demand the suppression of evidence seized at Regency. *Register* did not hold that an affidavit containing tainted evidence *cannot* be an independent source; it held that the search warrant in that case was an independent source of evidence under *Murray* because the warrant affidavit contained *no* information gained in the illegal entry—as distinguished from affidavits containing false or (as here) tainted information.[17]

For the forgoing reasons, we find that the district court erred in concluding that *Murray* and *Register* require suppression of evidence seized at Regency in the absence of subjective proof by the government that the tainted information did not affect the decision of this particular magistrate judge to issue the warrant. Instead, in all such cases the district court should consider whether the warrant affidavit, once purged of tainted facts and conclusions, contains sufficient evidence to constitute probable cause for issuance of the warrant.

The government claims that Wooley's warrant affidavit, when expunged of tainted information, still contains sufficient evidence linking Regency with narcotics trafficking to support the search warrant. When, as here, the determinative facts are not in dispute, the question of probable cause is one of law and may be resolved by this court.[18]

---

Cir.1991) (evidence admissible because defendant failed to delineate what evidence in affidavit was obtained illegally).

[17]931 F.2d at 311 (as affidavit contained no mention of information elicited by illegal search, warrant an independent source).

[18]Citing *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983), *U.S. v. Wake,* and *U.S. v. May,* 819 F.2d 531, 535 (5th Cir.1987), Judge Johnson, in his concurring opinion, contends that we should remand this case to the district court for that court's determination of whether the expurgated warrant affidavit provided probable cause for the magistrate judge's issuance of the search warrant. We believe that remand is neither required by the authorities cited by the concurrence nor compelled by the particular facts in this case. The authorities cited by the concurrence stand for the proposition that the court (whether district court or appellate court) ruling on the suppression motion gives deference to the decision of the magistrate judge (or court) that issued the warrant. An appellate court need not give deference, however, to the district court's deferential review of the magistrate judge's decision. Moreover, we seriously doubt that it is appropriate to apply the deferential, substantial basis standard of

When we exclude from Wooley's warrant affidavit those facts and conclusions that would not have been available but for the illegal entry into Regency,[19] the affidavit still contains the following information:  the confidential informant's tip about narcotics trafficking at Imogene;  the neighbor's tip about comings and goings at Imogene;  information from surveillance on the activities of Pulido and Restrepo;  evidence suggestive of narcotics trafficking seized from the blue Toyota;  Wooley's expert opinion that such conduct is typical of narcotics trafficking;  and the HL & P connection between Imogene (the suspected stash house) and Regency.  After consideration of this independently-acquired, untainted information, we find as a matter of law that the expurgated warrant affidavit provided sufficient information linking Regency with suspected narcotics trafficking to constitute probable cause for issuance of a search warrant.

## B. MOTIVATION:  MURRAY'S NEW REQUIREMENT

*Murray* states that a search pursuant to warrant is not a genuinely independent source of evidence "if the agents' decision to seek the warrant was prompted by what they had seen during the initial [illegal] entry."[20]  Thus, *Murray* instructs the trial court to determine—separate and apart from its determination of whether the expurgated warrant affidavit contains probable cause[21]—whether information gained through the illegal search influenced or motivated the officers' decision to procure

---

review to the issuing magistrate judge's decision when the magistrate judge never considered the warrant affidavit purged of tainted information and the district court never reviewed such action of the magistrate judge.

[19]The district court found that, but for the illegal entry that confirmed that Pulido was in the house, Wooley would not have known that Garcia was lying when she said that she and her two children were the only persons home.  Neither could Wooley have characterized Pulido as "hiding" or have connected (incorrectly) Pulido to the name Raphael Antonio Narvaez del Rio.

[20]108 S.Ct. at 2535.

[21]"*Murray* is most significant precisely because the majority refused to follow the rather common position taken by the lower courts, namely, that the fruit-of-the-poisonous-tree issue presented by cases of this genre can be resolved by focusing *only* upon the question of whether facts obtained by the prior illegal action were critical to the probable cause finding supporting the warrant."  Wayne R. LaFave, *Search and Seizure,* § 11.4(f), at 70 [1992 Supp,] (2d ed. 1987).

a warrant.[22]  In this case, therefore, this inquiry is answered in the negative if the district court finds that "the agents would have sought a warrant if they had not earlier entered" the Regency residence.[23] As LaFave explains, *Murray* is intended to deal with "the so-called "confirmatory search,' conducted for the precise reason of making sure it is worth the effort to obtain a search warrant."[24]

Here, the district court did not consider whether the results of the illegal search of Regency prompted or motivated the officers' decision to seek the warrant.  As motivation is a question of fact, we remand this issue to the district court.  We nonetheless point out, by way of guidance only, that, unlike the objective test of whether the expurgated affidavit constitutes probable cause to issue the warrant, the core judicial inquiry before the district court on remand is a subjective one:  whether information gained in the illegal search prompted the officers to seek a warrant to search Regency. In the best of all possible worlds, of course, there will be statements or other evidence directly probative of motivation or effect.  But in the usual case, in which direct evidence of subjective intent is absent, a court must infer motivation from the totality of facts and circumstances.

Having determined that the question is for resolution by the district court in first instance, we have not scrutinized the record for this sort of information.  We suggest, however, that the district court might wish to consider such items as the precise nature of the information acquired during the illegal search of Regency, the relative probative import of this information compared to all other information known to the officers, and the fact that Wooley obtained warrants for Imogene and Hollowgreen at the same time he obtained one for Regency.

---

[22]*Accord U.S. v. Mithun,* 933 F.2d 631, 636 (8th Cir.1991) (agent's decision to seek warrant not prompted by seeing flash suppressor);  *U.S. v. Bosse,* 898 F.2d 113, 116 (9th Cir.1990) (remanding to determine effect of illegal entry and search on the officers' decision to seek warrant);  *U.S. v. Halliman,* 923 F.2d 873, 880 (D.C.Cir.1991) (finding that prior entry did not influence decision to seek warrant not clearly erroneous).

[23]*Murray,* 108 S.Ct. at 2536.

[24]LaFave, *Search and Seizure,* § 11.4(f), at 70 [1992 Supp.].

## C. EXCLUSION UNDER RULE 403

The district court found that Restrepo lacked standing to challenge the illegal search of Regency, a determination not challenged by Restrepo before this court. Lack of standing means, of course, that evidence seized at Regency, even if ultimately determined to be excludable as to Pulido under the *Murray* analysis discussed above, is not excludable as to Restrepo, Pulido's alleged co-conspirator.

The district court then ruled that evidence seized in the search of Regency was inadmissible against Restrepo under Rule 403, concluding (without explaining why) that "its probative value is substantially outweighed by the danger of unfair prejudice." The government contends that the district court failed to give sufficient weight to the evidence's probative value, and suggests that the court found the evidence unfairly prejudicial merely because it stems from an illegal search that Restrepo, an alleged co-conspirator, lacks standing to challenge.

As we must remand for findings of fact and conclusions of law on the question of whether the illegal "security sweep" of Regency prompted the officers to seek the search warrant in the first place, we ask that the district court reconsider its exclusion of this evidence as to Restrepo under Rule 403. It seems to us that this reconsideration should comprise, among other things, the nature of the charges in the indictment against Restrepo—that is, conspiracy to distribute cocaine and aiding and abetting in that conspiracy—and the identification of Pulido in the indictment as Restrepo's co-conspirator. Particularly when, as here, only two persons are charged in the indictment as co-conspirators, logic dictates that evidence of the participation of one of the alleged co-conspirators is relatively more probative as to the other alleged co-conspirators than the same evidence might be if the parties were simply charged, as co-defendants, with the direct commission of the predicate crimes. Nevertheless, if the district court should once again determine as to Restrepo that the unfair prejudice flowing from the Regency evidence substantially outweighs its probative value, it will be incumbent upon that court to articulate fully the reasons for its ruling.

## III. CONCLUSION

As a matter of law we hold that Wooley's warrant affidavit, when purged of information gained through the initial search, still contains facts sufficient to constitute probable cause for the issuance of the warrant to search Pulido's residence. Concluding, however, that *Murray,* requires the trier of fact to determine whether the illegal search motivated the officers to seek the search warrant, we remand that issue to the district court. Lastly, as to Restrepo, we ask the district court to reconsider its ruling under Rule 403 to exclude evidence obtained in the search of Pulido's residence.

REVERSED in part and REMANDED in part.

JOHNSON, Circuit Judge, concurring:

While I agree that the majority has formulated the correct methodology for analyzing a warrant affidavit tainted by an illegal search, I am concerned with its conclusion that the warrant affidavit contains sufficient facts to constitute probable cause. It seems to me that it is at least a close question in this case whether the warrant affidavit, purged of the information gleaned from the illegal search, contains sufficient facts to support a finding of probable cause. Because the district court is in a better position to review the warrant affidavit, I would remand this case to the district court for its own probable cause analysis. *See Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983); *United States v. Wake,* 948 F.2d 1422, 1428 (5th Cir.1991); *United States v. May,* 819 F.2d 531, 535 (5th Cir.1987).[1]

---

[1]The majority in this case conducts a de novo review of the sufficiency of the warrant affidavit. I cannot join in this result. The Supreme Court in *Illinois v. Gates* has *expressly* forbidden de novo review of the sufficiency of a warrant affidavit. 462 U.S. at 236, 103 S.Ct. at 2331 ("we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review."). The reason for this rule is simple: the courts of appeals are ill equipped to undertake an extensive after-the-fact review of the sufficiency of a warrant affidavit.

Nonetheless, from the remote position of an appellate court, the majority would offend this rule and attempt to reevaluate the sufficiency of a warrant affidavit. The majority distinguishes *Gates* on the basis that *Gates* involves the review of a magistrate, not the district court. The majority concludes that "[a]n appellate court need not give deference ... to the district court's deferential review of the magistrate judge's decision."

In all other respects, I concur in the majority opinion.

---

Majority Opinion, slip opinion at 5956 n. 18. Significantly, however, the majority cites *no* authority for this distinction. *Nor* does it attempt to justify the distinction. I must conclude that the language in *Gates* requires that we remand. This Court is an inappropriate forum for the type of extensive review that the majority conducts in this case.