Houston WILLIAMS and Kathlene Williams *v.* STATE of Arkansas

CA CR 94-581                                           927 S.W.2d 801

Court of Appeals of Arkansas
En Banc
Opinion delivered July 3, 1996

*Finch & Gartin*, by: *Jay T. Finch* and; *Robert E. Irwin*, for appellants.

*Winston Bryant*, Att'y Gen., by: *J. Brent Standridge*, Asst. Att'y Gen., for appellee.

JOHN F. STROUD, JR., Judge. Kathlene Williams was found guilty of possession of marijuana with intent to deliver and two counts of possession of methamphetamine with intent to deliver. She was sentenced to a total of fifteen years in the Arkansas Department of Correction and a fine of $10,000. She appeals her conviction, asserting that the trial court erred: 1) in failing to grant her motion for a directed verdict; 2) in limiting the scope of cross-examination of a witness; 3) in denying her motion to sever offenses; 4) in denying her motion to suppress evidence found in her purse at the time of her arrest; 5) in denying her motion to suppress evidence obtained in a search of her home; and 6) in allowing the State to reopen its case to introduce additional evidence. Houston Williams was found guilty of possession of marijuana with intent to deliver and possession of methampetamine with intent to deliver and sentenced to a total of thirty years in the Arkansas Department of Correction and a fine of $25,000. He appeals asserting only that the trial court erred in failing to suppress evidence found in a search of his home. We find that the trial court erred in failing to suppress the evidence found in the search of the Williams' home and reverse and remand for a new trial.

On November 12, 1992, the Fayetteville Police Department received information from a confidential informant that Houston Williams was a trafficker of controlled substances who lived at 37 Centerwood in West Fork, Arkansas. According to the informant, Houston Williams traveled to Arizona and California to pick up large amounts of methamphetamine and brought them back to the

Northwest Arkansas area for distribution.

On December 31, 1992, the Fayetteville Post of Duty Drug Enforcement Administration Office received information from Special Agent Johnny Cardinez of the Drug Enforcement Agency in Alpine, Texas, that he had a confidential informant from the Northwest Arkansas area in custody in Alpine, Texas. The informant said that Butch and Kathleen Williams, who lived at 37 Centerwood in West Fork, Arkansas, would travel to Albuquerque, New Mexico, every three weeks and pick up approximately one to two pounds of methamphetamine and cocaine. They would return to West Fork, Arkansas, and distribute the drugs in the Northwest Arkansas area.

On February 22, 1993, at approximately 4:10 p.m., Detective McCarty received a phone call from Detective Scott Rogers of the 19th Judicial District Drug Task Force. Detective Rogers told Detective McCarty that he had just received a phone call from a confidential informant who told him that Henry Glosemeyer was leaving Rogers, Arkansas, with a person named Butch. The CI said that Glosemeyer and Butch were en route to 37 Centerwood in West Fork, Arkansas, where Glosemeyer was to pick up a large amount of methamphetamine. The informant gave Detective Rogers two vehicle descriptions, a red Ford Flareside pickup with license number TWT-932 and a gray Mercury Capri with license number WEI-997. The informant stated that Glosemeyer would then return to Rogers, Arkansas, around 9:00 p.m. to deliver the methamphetamine to his customers.

Upon receiving the information, officers went to the West Fork address. On the way there, Detective McCarty and Sgt. Tabor passed the 1991 gray Mercury Capri bearing Arkansas vehicle license WEI-997, which was southbound into West Fork. Later, the officers saw the car arrive at 37 Centerwood. Over a period of approximately 30 minutes, the officers saw the car leave the house on two occasions. Once it went to a car wash in West Fork; the second time it left southbound on Highway 71.

At approximately 7:30 p.m. on February 22, 1993, the surveillance officers saw a red Ford Flareside pickup arrive at 37 Centerwood in West Fork, Arkansas. The truck remained at the residence until approximately 8:00 p.m. when someone drove it to a church on McKnight Street and dropped off a passenger. The driver

then returned to the Centerwood address where the officers drove by and saw the driver place something behind the front seat of the truck.

On February 22, 1993, at approximately 8:35 p.m., the red Ford Flareside pickup left northbound on Highway 71 heading toward Fayetteville. Fayetteville Police Department Officer Brian Waters was contacted and asked to watch for a red pickup traveling north on Highway 71. Officer Waters, who was stationed on Highway 71 at the south city limits in Fayetteville, saw the truck and visually estimated its speed at 50 miles per hour. He then followed the truck and paced it at 48 miles per hour in a 45 mile per hour zone. Officer Waters continued to pace the truck and verified its speed. He stopped the truck when it went from a 45 mile per hour zone into a 40 mile per hour zone without slowing down.

The driver, Mr. Glosemeyer, was issued a warning for speeding. Officer Waters, noticing that Mr. Glosemeyer appeared nervous, asked him if he was transporting any guns, drugs, stolen property, or large sums of unreported cash. Mr. Glosemeyer said that he was not. Officer Waters asked if he would give consent to a search of the truck, and Mr. Glosemeyer said that he would. Officer Waters then filled out a consent to search form and explained it to Mr. Glosemeyer. He asked Mr. Glosemeyer to read the consent to search form and, if he had no objections, to sign it. Mr. Glosemeyer then read the consent form and signed it.

The officers searched the truck manually, but they did not find any contraband. Then they used a drug dog to search the truck, and the dog gave an active, aggressive alert. A second manual search was conducted, but nothing was found. The officers decided to transport the vehicle to an indoor facility where a thorough search could be conducted. During this search, they found approximately two ounces of a white powder substance under the truck bed mat. Detective McCarty field tested the powder, and it tested positive for the presence of methamphetamine, a Schedule II controlled substance.

The officer read Glosemeyer his Miranda rights. After being Mirandized, Glosemeyer told detective McCarty that he had received an extremely large amount of methamphetamine from Houston Williams over the last year. He said that in the last month he had dealt at least one pound of methamphetamine that he had

gotten from Williams. Glosemeyer stated that Williams borrowed his truck, drove to California, picked up four pounds of methamphetamine, and returned to West Fork, Arkansas, on February 22, 1993. He also said that, on February 22, 1993, he received two ounces of the methamphetamine from Williams at his residence in West Fork, Arkansas.

On February 23, 1993, based on the above information, Officers Norman, Tabor, Lovett, and Nelson arrived at 37 Centerwood at approximately 9:00 a.m. Norman and Tabor knocked on the door and were greeted by Kathlene Williams. Norman and Tabor identified themselves as narcotics officers and asked her if she would let them in to speak to her and her husband, Houston Williams. Kathlene Williams invited all four officers into the house. Norman observed an automatic pistol on top of a dresser located in the living room and immediately took possession of it and disarmed it. At that point, Tabor asked Kathlene Williams if her husband, Houston Williams, was home. She said that he was home but that he was asleep. Officers asked Mrs. Williams to wake him, and she went to the back bedroom and told her husband that the officers were there and wanted to speak with him. Mr. Williams came into the living room with his wife, and the officers immediately identified themselves as narcotics investigators.

Lovett and Nelson went into the kitchen with Mrs. Williams while Norman and Tabor sat in the living room area and spoke with Houston Williams. Norman and Tabor advised him that they were conducting a narcotics investigation which stemmed from the arrest of Henry Glosemeyer. Before asking Mr. Williams any questions, Norman advised him of his Miranda warnings. Mr. Williams agreed to talk with the officers. Mr. Williams denied knowing of any narcotics trafficking. Norman and Tabor told Mr. Williams that they believed that he knew the location of approximately four pounds of methamphetamine he had brought in from California. Mr. Williams again said that he was unaware of what the officers were talking about.

At approximately 10:00 a.m., Ronald Fox, a documented methamphetamine dealer, arrived at the Williamses' home. Tabor intercepted Fox, identified himself as a narcotics investigator, and told him that Houston Williams was under investigation for narcotics trafficking. Mr. Fox decided not to go inside the house, and he left the area.

At approximately 10:45 a.m., Norman asked Houston Williams if he would consent to a search of his residence by the officers. He refused. Houston Williams told the officers that he needed to use the restroom. He went to a restroom connected to his bedroom, and Norman followed him to the restroom and quickly scanned the master bedroom for any weapons. Norman scanned the adjoining bedroom, which had been converted into an office, and saw two handguns. He waited for Houston Williams to leave the restroom and then asked him if the handguns in the office were loaded. Houston Williams said that they were not and stated, "Go ahead and check."

Norman entered the office and checked both weapons to see if they were loaded; they were not. Norman observed a set of scales, sitting on a desk in the room, which were partially hidden by a bag of cookies. Norman moved the bag and saw what appeared to be a white rock sitting on the scales. Norman believed that this was a controlled substance and considered Houston Williams to be under arrest. Norman also saw what appeared to be a plastic bag in a partially opened drawer of the same desk where the scales were located. He opened the drawer and observed what appeared to be a large rock of suspected methamphetamine along with various drug paraphernalia including a mirror with powder residue, a spoon with residue, and several other empty plastic bags. Houston Williams told Norman that the methamphetamine was for his personal use.

While the officers were at the residence with Houston Williams, Lowry of the Drug Enforcement Administration contacted Assistant U.S. Attorney Steven Snyder of the Western District of Arkansas and advised him of the investigation. Snyder told the officers to clear the residence and obtain a search warrant for it. Snyder also authorized the prosecution of Houston Williams, and he was placed under arrest for possession of methamphetamine with the intent to distribute.

The officers obtained a search warrant based on the information obtained from the confidential informants, Henry Glosemeyer, and the officers' investigation of Williams's house. They executed the warrant and seized twenty-nine pieces of evidence.

On February 24, 1993, appellant Kathlene Williams went to court to attempt to post bail for Houston Williams. When she arrived at the courthouse, she was arrested based on the evidence

found during the search of her house the previous day, and her purse was searched incident to her arrest. The officers found .02 ounces of methamphetamine in her purse.

The trial court found both Houston and Kathlene Williams to be indigent and appointed counsel from the Washington County Public Defender's Office. Kathlene Williams obtained separate counsel in July 1993.

Both appellants filed a motion to suppress the evidence seized at their home without a search warrant, and the trial court granted the motion. The trial court denied motions to suppress the evidence seized as a result of the search pursuant to the search warrant. It also denied Kathlene Williams's motion to sever the trial to permit the defendants to be tried separately. The court originally granted her motion to sever the count in the information charging her with possession of methamphetamine as a result of the drugs found in her purse at the courthouse, but it later denied the motion.

At trial, a police officer testified, and the evidence seized as a result of the search of the Williams's house pursuant to the search warrant was admitted. At the close of the State's case, appellants made motions for directed verdicts, contending that there was insufficient evidence to convict them. As part of her motion for directed verdict, Kathlene Williams called attention to the fact that the State failed to have marijuana seized from the house introduced into evidence. The State asked to reopen its case and admit the marijuana, and the court allowed it to reopen its case over appellants' objections.

Kathlene Williams called character witnesses in her behalf, and the State offered the testimony of Terri Glosemeyer, Henry Glosemeyer's wife, in rebuttal. She testified that Kathlene Williams often used drugs with her when they lived together. When Kathlene Williams's attorney tried to cross-examine Terri Glosemeyer, the State objected to the relevance of any questions concerning her relationship with Henry Glosemeyer. The court sustained the objection, in part, by limiting the scope of cross-examination to asking whether she had been given any particular deal by the State for her testimony or any special favors or consideration.

Appellants renewed their motions for directed verdicts at the

close of their cases and again after the rebuttal testimony. The court denied the motions. The jury convicted both appellants of possession of marijuana with intent to deliver and possession of methamphetamine with intent to deliver.

■  We first consider Kathlene Williams's argument that the trial court erred in failing to grant a directed verdict in her favor on the counts charging her with possession of marijuana and methamphetamine with intent to deliver based on the drugs seized from her home. A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Mings v. State*, 318 Ark. 201, 884 S.W.2d 596 (1994). We review the sufficiency of the evidence before considering any alleged trial error and in doing so we must consider all the evidence, including any which may have been inadmissible. *Hardrick v. State*, 47 Ark. App. 105, 885 S.W.2d 910 (1994). When reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the appellee and affirm if the verdict is supported by substantial evidence. *Knight v. State*, 51 Ark. App. 60, 908 S.W.2d 664 (1995). Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resort to speculation or conjecture. *Id.*

Kathlene Williams contends that the State failed to prove that she was in possession of the drugs seized from her home because the only evidence connecting her to the drugs was circumstantial evidence that was also consistent with appellant's lack of knowledge of the drugs. She alleges that there is nothing to link her to the drugs found in her home. She also contends that character evidence is insufficient to convict.

■■  In order to convict a defendant of possession of a controlled substance, the State need not prove that the accused had actual possession of the controlled substance. *Darrough v. State*, 322 Ark. 251, 908 S.W.2d 325 (1995). Constructive possession, which is control or the right to control the contraband, is sufficient. *Crossley v. State*, 304 Ark. 378, 802 S.W.2d 459 (1991). Constructive possession can be implied where the contraband is found in a place immediately and exclusively accessible to the defendant and subject to his control. *Mosley v. State*, 40 Ark. App. 154, 844 S.W.2d 378 (1992). However, where the conviction is based on joint occupancy of the premises where contraband is found, the State must prove two elements: (1) that the accused exercised care, control, and

management over the contraband; and (2) that the accused knew that the matter possessed was contraband. *Darrough, supra.* Such control and knowledge can be inferred from the circumstances where there are additional factors linking the accused to the contraband. *Mosley, supra.*

In this case, there is sufficient additional evidence to link Kathlene Williams to the drugs found in her home. At trial, the State introduced several firearms into evidence which were seized from various locations around appellant's house. In addition, the State introduced into evidence marijuana along with rolling papers that were found in a desk drawer in the den of the house. It introduced four bags of methamphetamine, a bottle of Inositol powder, and a set of small plastic scales seized from the middle desk drawer of the desk in the den. It also presented a plastic bag containing powdered methamphetamine and a plastic bag containing a rock of methamphetamine which were seized from a different drawer in the desk. In addition, the State introduced twelve plastic bags of marijuana seized from the freezer part of the refrigerator in the kitchen and a photograph showing a brown paper bag in which the marijuana was found in the freezer. The presence of numerous firearms, drug paraphernalia, and the large quantity of drugs throughout the house in various locations, coupled with testimony by the State's rebuttal witness that she had used methamphetamine on numerous occasions with the appellant in her home and helped her bag the drugs, was sufficient to link her with the contraband. Thus, there was sufficient evidence for the jury to infer that she was in possession of the marijuana and methamphetamine, and there was substantial evidence to support appellant's conviction.

Both appellants argue that the trial court erred in denying their motions to suppress the drugs, drug paraphernalia, and firearms seized from their home during the execution of the search warrant. They claim that the search warrant was invalid under the "fruit of the poisonous tree" doctrine because some of the facts set forth in the affidavit for the search warrant to establish probable cause to search their home were discovered in a previous, unlawful search of their home.

In reviewing a trial court's denial of a motion to suppress evidence, we make an independent determination based on the totality of the circumstances and reverse the trial court's ruling only if it is clearly against the preponderance of the evidence. *Phillips* v.

*State,* 53 Ark. App. 36, 918 S.W.2d 721 (1996).

The trial court found that the officers' initial intrusion into appellants' home, which yielded information used in the affidavit for the search warrant, was an unlawful search and suppressed the evidence seized in that initial search. The State's position is that the initial intrusion was not an unlawful search because the appellants consented to the officers entering their home and the contraband found in the initial visit to appellants' home was in plain view. Thus, the initial issue we must decide is whether the information contained in the affidavit was the result of an unlawful search.

▌ Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment — subject to a few specifically established and well-delineated exceptions. *Washington* v. *State,* 42 Ark. App. 188, 856 S.W.2d 631 (1993)(citing *California* v. *Acevedo,* 500 U.S. 565 (1991)). The observation of evidence in plain view, however, is not a search and therefore the resulting seizure is not the result of an unreasonable search. *Id.* The requirements of the plain view exception are: (1) the initial intrusion must be lawful; (2) the discovery of the evidence must be inadvertent; and (3) the incriminating nature of the evidence must be immediately apparent. *Stout* v. *State,* 320 Ark. 552, 898 S.W.2d 457 (1995).

▌ In this case, Kathlene Williams consented to the officers' entry into the Williamses' home; thus, the officers' intrusion was lawful. Although the testimony indicates that some of the firearms seized may have been in plain view such that their discovery was inadvertent, other contraband was not. Officer Norman testified that he moved a bag of cookies away from a set of scales in order to see a rock-like substance on the scale. He also said that he opened a desk drawer because he saw the top of a plastic bag hanging out. Upon opening the drawer, he saw what appeared to be methamphetamine and drug paraphernalia. Clearly, Officer Norman's discovery of the methamphetamine was not inadvertent. Thus, the plain view exception to the warrant requirement does not apply to the drugs and drug paraphernalia described in the affidavit for the search warrant.

When he opened the desk drawer and moved the bag away from the scales, Officer Norman conducted a search of appellant's home. He did so without a warrant, and none of the exceptions to

the warrant requirement of the Fourth Amendment apply. Thus, Officer Norman conducted an unlawful search of appellant's home. The information gleaned in this unlawful search was included in Officer Norman's affidavit for the search warrant.

■   The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search and of testimony concerning knowledge acquired during an unlawful search. *Murray* v. *United States*, 487 U.S. 533 (1988). Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence that is acquired as an indirect result of the unlawful search. *Id.* However, evidence received through an illegal source is admissible if it is also obtained through an independent source. *Id.*

■   The State argues that application of the independent-source doctrine renders the search of the Williamses' home valid and the evidence seized admissible. The United States Supreme Court addressed a similar situation in *Murray, supra,* and held that the ultimate question that must be addressed is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue. *Murray* has been interpreted to require a two-step analysis in determining whether the search was in fact an independent source. *See, U.S.* v. *Restrepo,* 966 F.2d 964 (5th Cir. 992) and *State* v. *Gulbrandson,* 906 P.2d 579 (Ariz. 1995).

■   We believe that *Gulbrandson, supra,* sets forth the proper method under *Murray* for determining the validity of a search pursuant to a warrant based on an affidavit that contains information unlawfully obtained. The first step is to excise the illegally obtained information from the affidavit and determine whether the remaining information is sufficient to establish probable cause. The second step is to examine whether the information gained from the illegal entry affected the officers' decision to seek the warrant or the magistrate's decision to grant it.

■   We find that, when the information obtained by the officers in the initial, unlawful search is excised from the affidavit in this case, there is sufficient information left to constitute probable cause. The officers had information from three different confidential informants over a period of several months indicating that Houston Williams was engaged in methamphetamine trafficking. In addition, Glosemeyer told police that Williams was trafficking in

methamphetamine out of his house. Although the affidavit did not specifically set forth facts that would tend to show the reliability of the informants, the officers corroborated or confirmed many of the tips given by informants. They confirmed the description of the vehicles en route to Williams's home, the identity of the driver of one of the vehicles, and the presence of methamphetamine in one of the vehicles. In addition, Glosemeyer's admission that over a long period and currently he had been buying methamphetamine from the home of Houston Williams implicated that property. Under the "totality of the circumstances" test set forth in *Illinois* v. *Gates*, 462 U.S. 213 (1983), we believe that Norman's affidavit is sufficient to establish probable cause even after the illegally obtained information is excised. Thus, under the first part of the *Murray* analysis, the warrant would be valid.

Under the second part of the *Murray* analysis, we next examine the question of whether the illegal entry affected the officer's decision to seek the warrant. Officer Norman testified that the reason the officers did not get a search warrant before they went to the Williamses' house the first time was because the Prosecuting Attorney of Washington County told them that they did not have enough information to establish probable cause. He said that they gained sufficient additional information during the search to get the search warrant. In light of this testimony by the officer who eventually sought the warrant, we find that his decision to seek the warrant was prompted by what he saw during his initial, unlawful search. Thus, under *Murray* v. *United States*, 487 U.S. 533 (1988), we find that the exclusionary rule mandates exclusion of the evidence seized pursuant to the search warrant. Accordingly, we find that the trial court erred in refusing to suppress the evidence and reverse and remand for a new trial as to both appellants.

Kathlene Williams's argument that the trial court erred in allowing the State to reopen its case to introduce a pound of marijuana into evidence is not likely to recur on retrial; thus, we do not address it. She has, however, raised other allegations of error that are likely to recur on retrial, which we address in order to prevent piecemeal appeals.

Kathlene Williams argues that the trial court erred in limiting the scope of her cross-examination of Terri Glosemeyer. Although this issue may arise on retrial, we are unable to address this argument because she failed to make a sufficient proffer of the

excluded evidence. There is no information in the abstract from which this court can determine the substance of the offer. Appellant's counsel merely· stated that he intended to ask questions about Mrs. Glosemeyer's relationship with Mr. Glosemeyer to show that she was biased. There was no proffer of the substance of these questions. There must be a proffer of the evidence that is improperly excluded for us to find error. Ark. R. Evid. 103(a)(2), *Parker* v. *State*, 268 Ark. 441, 597 S.W.2d 586 (1980). Thus, we cannot address this issue. *See Hodge* v. *State*, 27 Ark. App. 93, 766 S.W.2d 619 (1989).

Kathlene Williams also argues that the trial court erred in refusing to sever the offense of possession on the day she was arrested from the possession charge stemming from the search of her house the day before because the second offense was not a part of a single scheme or plan, and evidence of one offense would not be allowed in a separate trial to prove the other offense. She contends that the charges involving the drugs found at her house were independent of the subsequent charge of possession of methamphetamine for the drugs found in her purse at the courthouse. The trial court initially granted her motion to sever, but later denied it.

When offenses are based on the same conduct or a series of acts connected together or constituting parts of a single scheme or plan, they may be joined for trial. *McArdell* v. *State*, 38 Ark. App. 261, 833 S.W.2d 786 (1992). The decision to join or sever offenses is within the discretion of the trial court, and we will not reverse absent an abuse of discretion. *Id*. The State argues that the offenses of possession of methamphetamine and marijuana with intent to deliver occurring on February 23, 1993, and the offense of possession of methamphetamine one day later on February 24, 1993, were part of a single scheme or plan because they involved appellant possessing the same type of controlled substance close in time in the same general area. Appellant argues that this is insufficient and cites *Teas* v. *State*, 266 Ark. 572, 587 S.W.2d 28 (1979), for the proposition that the sale of drugs on two different occasions by a defendant to an informer was insufficient to constitute a single scheme or plan. However, the facts of this case are clearly distinguishable from those present in *Teas*. In *Teas, supra*, a confidential informant bought marijuana from the defendant on December 5, 1977, and morphine from the defendant on December 14, 1977. In

this case, Kathlene Williams was found in possession of the same type of drug on the day after the original seizure of contraband from her home. Under these circumstances, we cannot say that the trial court abused its discretion in refusing to sever the offenses. These acts are sufficiently similar in character, location, and time to constitute a continuing course of conduct which, in effect, constituted a single scheme or plan.

Finally, Kathlene Williams contends that the trial court erred in failing to grant her motion to suppress the evidence found in her purse which was searched incident to her arrest. She claims that her arrest was invalid because the probable cause for her arrest was based on evidence obtained when the police executed the invalid search warrant on her home. We agree.

At the time of Kathlene's arrest, the only probable cause that existed for the officers to believe that she had committed or was committing a crime was the information obtained from the unconstitutional search of her home. Thus, her arrest was unlawful. Any evidence obtained as a result of an unconstitutional and unlawful arrest must be excluded at trial unless it falls within one of the exceptions because it is considered fruit of the poisonous tree. *Brown v. Illinios*, 422 U.S. 590 (1975); *Wong Sun v. United States*, 371 U.S. 471 (1963). Thus, the trial court erred in failing to suppress the methamphetamine found in Kathlene's purse in the search incident to her arrest.

Reversed and remanded.

JENNINGS, C.J., MAYFIELD, NEAL, and GRIFFEN, JJ., agree.

ROBBINS, J., concurs in part, dissents in part.

JOHN B. ROBBINS, Judge, concurring in part, dissenting in part. I concur that this case should be reversed and remanded. However, I would reverse and remand to allow the trial court to make findings of fact in regard to the second step under *Murray v. United States*, 487 U.S. 533 (1988).

I agree with the majority's rationale concerning the first step of the *Murray* analysis. The officers had sufficient independent information from other sources, *i.e.*, sources other than the illegally obtained information, that established probable cause for the issuance of the warrant. Those facts are accurately reflected in the majority opinion. However, I believe that based upon the persua-

sive authority of *United States* v. *Restrepo*, 966 F.2d 964 (5th Cir. 1992), cited in the majority opinion, we should reverse and remand.

The second part of the *Murray* analysis is whether or not the illegal entry, and any evidence or information obtained as a result of the illegal entry, affected the officers' decision to seek the warrant. As noted by the majority, the officers did not get a search warrant prior to their first entry into the appellants' home. Although the officers sought assistance from the Washington County prosecutor in obtaining a warrant, he told them that, in his opinion, they did not have enough information to establish probable cause for one. The officers presented the prosecutor with the same information that the majority opinion states was sufficient to establish probable cause.

I believe that the majority opinion goes too far in applying the second part of the *Murray* analysis by effectively making our appellate court a fact-finding court. The majority opinion states that "we find that [the officer's] decision to seek the warrant was prompted by what he saw during his initial, unlawful search." In both *Murray* and *Restrepo* the cases were remanded for the trial courts to consider whether or not the results of the illegal searches prompted or motivated the officers' decision to seek the warrant. In *Restrepo* the court stated that the officers' motivation is a question of fact for the trial court to decide.

In the present case the trial court did not consider whether the results of the illegal first search of appellants' home prompted or motivated the officers' decision to seek the warrant. Such a determination is subjective and must be based on factual matters including statements of the officers or other evidence directly probative of motivation. I believe that the majority has done exactly what the *Restrepo* court warned against by scrutinizing the record for evidence concerning motivation. This is a finding of fact that was not made by the trial court and it is not within our province to make such findings. As noted above, it is clear that the officers were motivated to obtain a warrant prior to the illegal search and only failed to pursue issuance of a warrant because of a prosecutor's opinion, which in hindsight was incorrect. Consequently, some motivation to obtain a warrant existed both before and after the illegal search.

I would reverse and remand for the trial court to resolve this issue by making such findings of fact as are necessary to determine the officers' primary motivation for seeking the warrant in question.