Houston WILLIAMS and Kathlene Williams *v.* STATE of Arkansas

CR 96-834 939 S.W.2d 264

Supreme Court of Arkansas
Opinion delivered February 10, 1997

214

*Robert E. Irwin*, for appellant.

*Winston Bryant*, Att'y Gen., by: *J. Brent Standridge*, Asst. Att'y Gen., for appellee.

W.H."DUB" ARNOLD, Chief Justice. Houston and Kathlene Williams are husband and wife. Houston Williams was sentenced to a total of thirty years in prison for possession of marijuana with intent to deliver and possession of methamphetamine with intent to deliver. He also received a $25,000 fine. Kathlene Williams was convicted of the same two offenses, plus an additional count of possession of methamphetamine with intent to deliver. She received a total of fifteen years in prison and a $10,000 fine. The Arkansas Court of Appeals reversed and remanded the convictions on the basis that the search warrant used to gather evidence against Mr. and Mrs. Williams was illegally obtained. *Williams v. State*, 54 Ark. App. 352, 927 S.W.2d 801 (1996). We granted the State's petition for review. Upon our review, we affirm the decision of the trial court.

The search warrant that is the subject of this case was executed at the Williams's home on February 24, 1993. Pursuant to the warrant, officers seized, among other items, approximately eighty-three grams of methamphetamine, approximately twelve ounces of marijuana, several handguns, and a wall safe containing $8,200 in cash. The facts leading up to the procurement of the warrant are set out in detail in the court of appeals opinion, but we will set them out again here, for the sake of convenience. On November 12, 1992, the Fayetteville Police Department received information from a confidential informant that Houston Williams of a certain address in West Fork, Arkansas, was an extremely large trafficker of controlled substances. The informant stated that Williams would travel to California and Arizona, pick up large amounts of methamphetamine, then return to northwest Arkansas to distribute the drug. The informant further stated that he had seen Houston Williams with as much as $65,000 in cash at one time.

On December 31, 1992, the Fayetteville Drug Enforcement Administration office received word from a special agent in Alpine, Texas, that the agent had an informant in custody. The

informant was from northwest Arkansas and stated that Houston and Kathlene Williams would travel to New Mexico every three weeks, pick up one to two pounds of methamphetamine and cocaine, then return to northwest Arkansas to distribute the drugs.

On February 22, 1993, at approximately 4:00 p.m., Detective Rogers of the 19th Judicial District Drug Task Force received a phone call from a confidential informant. The informant stated that Henry Glosemeyer and Houston Williams would be leaving the city of Rogers and driving to the Williams house in West Fork. The informant described in detail the two vehicles that would be driven, including the license-tag numbers. He said that Glosemeyer was to pick up a large amount of methamphetamine, then return to Rogers at 9:00 p.m. to deliver the drugs to his customers. Detective Rogers relayed this information to Detective McCarty of the Fayetteville Police Department. Upon receipt of the information, McCarty and four other officers drove to Williams's West Fork address. While en route, two of the detectives saw one of the described vehicles, a gray Mercury Capri, arrive at the residence. Approximately three hours later, the other described vehicle, a red pickup, arrived. At 8:35 p.m., the pickup left the residence, driving toward Fayetteville. Fayetteville police were notified to be on the lookout for the vehicle. Shortly thereafter, officer Brian Waters saw the truck, fell in behind it, and clocked it at forty-eight miles per hour in a forty-five-miles-per-hour zone. When the truck moved into a forty-mile-per-hour zone, he pulled it over and issued a warning for speeding. The truck was being driven by Henry Glosemeyer. Upon being questioned by Officer Waters, Glosemeyer gave consent to search the vehicle. Nothing was found during the manual search, but the officer's drug dog gave an active, aggressive alert. The vehicle was moved from the side of the road to a facility where a more thorough search could be conducted. As a result, two ounces of methamphetamine were found under the truck bed mat.

Glosemeyer was arrested and gave a statement. He said he had received an extremely large amount of methamphetamine from Houston Williams over the last year and that he had dealt at least one pound in the past month. The methamphetamine that was recovered from the search of his truck had been received from

Houston Williams that night. Glosemeyer further stated that Williams had borrowed his truck, driven to California, and picked up four pounds of methamphetamine. Williams had returned that night.

The next morning, four officers went to the Williams residence. At that point, they had been told by the prosecutor's office that they did not have enough probable cause to obtain a search warrant. Upon arriving at the residence, they identified themselves as narcotics officers. They asked Kathlene Williams if they might speak to her husband. Mrs. Williams allowed the officers to enter the house. She said her husband was sleeping. They asked her to wake him and she went to the bedroom to do so. As she left the living-room area, Officer Norman observed an automatic pistol on a shelf. He took possession of it and unloaded it.

Houston Williams came into the living room within a few minutes. The officers questioned him and Mrs. Williams in separate rooms for well over an hour. They confronted Houston Williams with the information that indicated he was involved in drug trafficking. Williams denied any knowledge of such activity. Finally, the officers asked if Williams would consent to a search of the house. He said no.

At the end of the interrogation, and after consent to search had been denied, Williams said he had to go to the bathroom. Officer Norman, without invitation, followed Williams down the hall and watched him enter into a bathroom off the master bedroom. The officer made his way back up the hall, scanning the other rooms along the way. He pushed open a partially opened door to the den and noticed two weapons on a desk. When Williams came out of the bathroom, he told Officer Norman that the guns were unloaded and that he could check them if he liked. Norman entered the room and, in doing so, noticed a set of scales on a desk. He moved a bag of cookies which were obscuring the scales and saw a white rock sitting on the scales. He believed the rock to be a controlled substance. Looking further, Norman saw a part of a plastic bag protruding from a desk drawer. He opened the drawer and observed what he suspected to be a controlled substance, along with various items of drug paraphernalia. Houston

Williams was placed under arrest. One of the officers present contacted an assistant U.S. attorney and advised him of what was in progress. The attorney told the officers to leave the premises and obtain a search warrant.

The search warrant was obtained later that day and executed on February 24, 1993. In the affidavit in support of probable cause, the officers included the information provided by the two confidential informants, the statement by Henry Glosemeyer, and the observation of what appeared to be drugs and drug paraphernalia in the Williams home. Also on February 24, Kathlene Williams was arrested when she appeared at the courthouse to post bail for her husband. Her purse was searched and .02 ounces of methamphetamine was found.

At trial, the appellants claimed that the officers' initial, warrantless search of their home was illegal. They contended further that the evidence obtained in the initial search prompted the officers' decision to obtain a search warrant, making the warrant illegal as well. The trial judge agreed that the initial search of the Williams's home was unlawful. However, he did not agree that the illegality of that search affected the validity of the warrant. Therefore, the evidence obtained as a result of the execution of the search warrant was admitted at trial. The Williamses argue on appeal that the trial court should have suppressed that evidence.

Our analysis on appeal must be twofold. First, we must determine whether the evidence obtained by the officers on their first visit to the Williams home was the result of an illegal search. If the search was legal, there is nothing to taint the warrant. If the search was illegal, we must then determine the effect of that illegality on the procurement of the search warrant.

### Legality of the Initial Search

The State urges us to hold the initial search constitutional based upon the plain-view doctrine. We have said in the past that this doctrine may be applied under the following circumstances: 1) the initial intrusion was lawful; 2) the incriminating nature of the items was immediately apparent; and 3) the discovery of the items was inadvertent. *Johnson v. State*, 291 Ark.

260, 724 S.W.2d 160, *cert. denied*, 484 U.S. 830 (1987). However, the State directs us to a different standard enunciated in the recent United States Supreme Court case of *Horton v. California*, 496 U.S. 128 (1990). In *Horton*, the Court held that the plain-view doctrine is applicable if the officer has a lawful right of access to the object and if the incriminating nature of the object is readily apparent. The State contends that *Horton* dispensed with the inadvertence requirement. We have not had occasion to discuss this aspect of the *Horton* case. We do not find it necessary to do so now. The incriminating items which were discovered by Officer Norman during the search simply were not in his plain view. The most elemental aspect of the plain-view doctrine has not been met. The rationale behind the plain-view doctrine is that the observation of items in plain view is not a search. *Johnson v. State, supra*. Once an officer's activity crosses the line from observation into a probing quest for evidence, a search has begun, and the realm of the plain-view doctrine is left behind. *See generally State v. Risinger*, 297 Ark. 405, 762 S.W.2d 787 (1989) (although a container on a table was in plain view, its contents were not; thus the plain-view doctrine did not apply to the contents). The incriminating items observed by Officer Norman in this case — the rock on the scale, along with the substance and explicit paraphernalia inside the drawer — were not discovered through mere observation. In moving the bag of cookies and opening the desk drawer, the officer crossed the line into a search. A similar situation arose in *Arizona v. Hicks*, 480 U.S. 321 (1987). An officer was rightfully inside a residence which he suspected contained stolen stereo equipment. When he observed a stereo turntable, he moved it to look for a serial number. The Court held that the officer's movement of the equipment to view it further constituted a search. The officer was engaged in a quest for evidence, as opposed to mere observation of an object without disturbing it.

██ The facts show that a warrantless search of the appellants' residence took place. Warrantless searches of a suspect's home are presumptively unreasonable. *Guzman v. State*, 283 Ark. 112, 672 S.W.2d 656 (1984). The State has the burden of proving such a search is reasonable. *Willett v. State*, 298 Ark. 588, 769 S.W.2d 744 (1989). That burden is particularly difficult in this

case in light of the fact that, just before the search took place, consent to search was denied. As none of the exceptions to the warrant requirement can be shown by the State, we agree with the trial court that the initial search conducted in the appellants' home was unlawful.

### Legality of the Search Warrant

 Having decided that the warrantless search was illegal, we move to the question of that illegality's effect on the validity of the warrant. While the exclusionary rule prohibits the introduction of tangible and testimonial evidence derived from an unlawful search, such evidence may nonetheless be admissible if discovered through an independent source. *See Murray v. United States*, 487 U.S. 533 (1988). This tenet is referred to as the "independent-source doctrine." *Murray* involved an illegal entry into a warehouse where all subsequent activity by the police officers was suspect. While unlawfully in the warehouse, the police officers observed bales of marijuana. They then sought a search warrant. The Court stated:

> The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the illegal entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.

*Murray*, 487 U.S. at 542. The first prong of *Murray* is usually approached by excising the offending information from the probable-cause affidavit and then determining whether the affidavit nevertheless supports the issuance of a search warrant. *See United States v. Restrepo*, 966 F.2d 964 (5th Cir. 1992), *cert. denied*, 506 U.S. 1049, 113 S.Ct. 968 (1993); *United States v. Herrold*, 962 F.2d 1131 (3rd Cir.), *cert. denied* 506 U.S. 958, 113 S.Ct. 421 (1992). The affidavit in this case contained a wealth of information about the Williams's possible drug-trafficking activities. Even in the absence of the information obtained in the prior search, officers had detailed information from three confidential informants, plus the statement of Henry Glosemeyer, who had just come from the

Williams's residence. Thus, the first prong of the *Murray* test weighs in favor of the validity of the warrant.

■ The second prong of *Murray* focuses on the motivation of the officers in obtaining the warrant. A key consideration in determining this issue is the "relative probative import" of the information secured during the illegal search "compared to all other information known to the officers." *United States v. Restrepo, supra,* at 972. While the police should not profit from illegal activity, neither should they be placed in a worse position than they would otherwise have occupied. *Murray,* 587 U.S. at 542.

In the instant case, unlike the facts in *Murray,* there was no illegal entry. Kathlene Williams allowed the officers to enter the residence, and, while the officers testified that they informed Houston Williams that he could ask them to leave the residence at any time, he never requested that they do so. Furthermore, we think it significant that, when Officer Norman contacted the prosecutor's office about obtaining a warrant prior to entering the residence, he was advised that he lacked probable cause. Thus, we cannot agree that there was a complete absence of motivation on the part of the officers to seek a warrant prior to the lawful entry and subsequent illegal search.

Immediately upon lawfully entering the house, Officer Norman observed a Smith & Wesson .9 millimeter automatic pistol on top of a dresser. While the officers were present, Ronald Fox, whom they had documented as dealing in methamphetamine, arrived at the home but would not enter the residence. This evidence, obtained prior to the illegal search, could be properly considered by the issuing magistrate.

■ When asked at the suppression hearing to explain the basis for his request for a search warrant of the Williams residence, Officer Norman reviewed not the items seized from the illegal search, but the information received from the confidential informants, the statement acquired from Glosemeyer, and the surveillance conducted by officers. In light of this testimony, we cannot conclude that the officers were prompted to obtain the search warrant after obtaining the tainted information. In any event, as

the officers collected ample information to support a search warrant, independent of and prior to the items found in the illegal search, we hold that the independent-source doctrine permitted the introduction of evidence seized after the search warrant. To hold otherwise, we would be placing the officers in a worse position than they would otherwise have occupied. Under these circumstances, we affirm the trial court's order upholding the validity of the warrant.

Affirmed.

NEWBERN and GLAZE, JJ., dissent.

DAVID NEWBERN, Justice, dissenting. The majority opinion bases the affirmance in this case upon *Murray v. United States,* 487 U.S. 533 (1988), and its exposition of the independent-source doctrine. In the *Murray* case, the Supreme Court's opinion states that the United States District Court found that agents who conducted an illegal search prior to obtaining a search warrant "did not reveal their warrantless entry to the Magistrate" who subsequently issued a search warrant. 487 U.S. at 543. In discussing the independent-source doctrine, Mr. Justice Scalia, on behalf of the Supreme Court majority, wrote:

> The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, *or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.*

487 U.S. at 542 (emphasis added, footnote omitted).

It is no wonder the State does not cite the *Murray* case in this appeal; rather, it cites *Segura v. United States,* 468 U.S. 796 (1984), with a "*Cf.*" signal in support its independent-source doctrine argument. The *Segura* case, as described in the *Murray* case opinion, "held that police officers' illegal entry upon private premises did not require suppression of evidence subsequently discovered at those premises when executing a search warrant obtained on the

basis of information *wholly unconnected with the initial entry*." 487 U.S. at 535, emphasis added.

The State's petition for review and the majority opinion acknowledge that the affidavit presented to the judge who issued the search warrant contained information about the previous illegal search and evidence found in that search. It is apparent that, in the circumstances presented here, the *Murray* case and the independent-source rule do not apply.

In its supplemental brief to this Court on review of the Court of Appeals decision, the State asks that we evaluate the search warrant affidavit by excising the "improper" portion, citing by analogy *Pyle v. State,* 314 Ark. 165, 862 S.W.2d 823 (1993), which involved a search warrant affidavit that contained false and misleading statements. There we noted that, to disqualify the affidavit, the statements of the officers must have been "knowingly" false or made "recklessly" without knowledge of their truth or falsity. We held that the evidence did not support any such conclusion. We also said, however, that even if such a conclusion were supported by the evidence, statements in the affidavit other than those alleged to have been false would have been sufficient to support the issuance of the search warrant. Inconsistent with the language in the *Murray* opinion, the majority opinion takes that approach, citing United States Court of Appeals cases.

For any court to say the decision of the judge issuing a search warrant was not "affected by" the presence of information such as that presented as the result of an acknowledged illegal search in this case is to wink at a serious violation of the Fourth Amendment.

Some may applaud the majority opinion as overcoming form in favor of substance or as not letting the guilty get away due to "technicalities." Although not a very handsome one, "technicalities" is another name for the Bill of Rights. Our duty is to do what we can to prevent the home of any citizen from being subjected to unlawful intrusion or search by the government. The only way to accomplish it is to hold that evidence obtained as the direct or indirect result of a constitutional violation is inadmissible.

The result reached by the Arkansas Court of Appeals reversing the convictions in this case was correct.

I respectfully dissent.

GLAZE, J., joins.