Houston WILLIAMS and Kathlene Williams *v.*
STATE of Arkansas

CR 96-848                                   944 S.W.2d 822

Supreme Court of Arkansas
Opinion delivered May 12, 1997

*Kent McLemore* and *Finch & Gartin*, by: *Jay T. Finch*, for appellants.

*Winston Bryant*, Att'y Gen., by: *Clint Miller*, Acting Deputy Att'y Gen., for appellee.

DAVID NEWBERN, Justice. Houston and Kathlene Williams were convicted of conspiracy, Ark. Code Ann. § 5-3-401 (Repl. 1993), to deliver methamphetamine. Ark. Code Ann. § 5-64-401(a) (Supp. 1995). The primary evidence against them came from testimony given by Henry and Terry Glosemeyer. There was additional testimony from police officers and a chemist, but the only evidence given by those witnesses that implicated the Williamses came from the Glosemeyers or from Fred Colvin. Mr. Colvin, who did not testify, had given a statement to a police officer implicating the Williamses as drug dealers. Mr. Colvin was pronounced by the Trial Court to be an accomplice to the conspiracy as a matter of law. The Trial Court left the question whether the Glosemeyers were accomplices to the jury.

It was the contention of the Williamses at the trial that the Glosemeyers should have been declared accomplices as a matter of law by the Trial Court, and therefore, as there was no corroborating evidence, their motions for directed verdict should have been granted. That has remained their primary contention on appeal.

The Arkansas Court of Appeals affirmed the convictions by a tie vote, *Williams v. State*, 54 Ark. App. 271, 927 S.W.2d 812 (1996), and we granted the Williamses' petition for review. We agree that corroborating evidence was required. As there was none, it was error to deny the directed–verdict motions. We reverse and dismiss the convictions.

■ When we grant a petition to review a case decided by the Court of Appeals, we treat it as if it were before us in the first appellate instance. *Allen v. State*, 326 Ark. 541, 932 S.W.2d 764 (1996). In reviewing Mr. Williams's abstract, we noted that his counsel mistakenly presented the judgment and commitment order from a previous conviction of Mr. Williams for possession with intent to deliver methamphetamine and marijuana and not the one relevant to this case. Although the State has not raised an issue as to the inadequacy of Mr. Williams's abstract, we must address it.

■    In *Winters v. Elders,* 324 Ark. 246, 247, 920 S.W.2d 833, 834 (1996), we said we have "long held that the judgment appealed from is a bare essential of an abstract" and cited numerous cases. In *Jolly v. Hartje,* 294 Ark. 16, 18, 740 S.W.2d 143, 144 (1987), we wrote, "Ordinarily the basic pleadings and judgment or decree appealed from are essential constituents of the abstract, as we have frequently noted." The question we must answer as a preliminary matter is whether the failure to include the appropriate judgment and commitment order in the abstract makes it "flagrantly deficient." Ark. Sup. Ct. R. 4-2(b)(2).

■    We choose not to declare Mr. Williams's abstract "flagrantly deficient." Except for the omission of the judgment and commitment order, the abstract is complete and exemplary. We know from his uncontested statement of the case that Mr. Williams was convicted of conspiracy to deliver methamphetamine and that he was sentenced to thirty years' imprisonment for that offense. We are aware that in other cases, such as the recent decision in *Jewell v. Miller County Election Comm'n,* 327 Ark. 153, 936 S.W.2d 754 (1997), we have declined to look to other parts of a brief or abstract to find information that should have been included elsewhere. That, however, was a case in which we were given a nine-page abstract to depict a 1500-page record and six volumes of exhibits. Even in the case of *Winters v. Elders, supra,* where we declared an abstract of the judgment "essential," we had an additional reason for affirmance based on incompleteness of the record. While an abstract of the judgment from which the appeal comes is "ordinarily" required, its absence does not necessarily constitute a flagrant deficiency requiring affirmance, and it does not in this case.

■    The Williamses were convicted of possession of methamphetamine and marijuana with intent to deliver on January 7, 1994. Mr. Williams was sentenced to thirty years in prison and a $25,000 fine. Ms. Williams was sentenced to fifteen years in prison and a $15,000 fine. We affirmed that conviction. *Williams v. State,* 327 Ark. 213, 939 S.W.2d 264 (1997). They were then tried and convicted on February 2, 1994, on the conspiracy charge. He received a sentence of thirty years' imprisonment, and she was sentenced to twelve years' imprisonment.

Prior to trial, Mr. Williams, in a motion joined by Ms. Williams, moved the Trial Court to declare Mr. Glosemeyer an accomplice as a matter of law in accordance with Ark. Code Ann. § 16-89-111(e)(1) (1987). Section 16-89-111(e)(1) provides:

> A conviction cannot be had in any case of felony upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof.

The motion was denied.

Mr. Glosemeyer testified that charges were pending against him for possession of two ounces of methamphetamine with intent to deliver. He said he and Ms. Glosemeyer took jobs with Lloyd McCord Trucking in Springdale in 1991. They met the Williamses, who were then working for the same trucking company, around Thanksgiving of 1991. Mr. Glosemeyer stated that the Williamses lost their jobs before Christmas of that year. In Mr. Glosemeyer's words, this "was the first time [he] had an occasion to talk to [the Williamses] about procuring drugs."

Mr. Glosemeyer testified that he and Mr. Williams reached an agreement whereby Mr. Williams would take a gun owned by Mr. Glosemeyer to California and attempt to sell it for money, or trade it for drugs which he would then sell for money. Mr. Glosemeyer stated that he and Mr. Williams agreed to split whatever Mr. Williams obtained for the gun. Mr. Williams made the trip to California and later gave Mr. Glosemeyer one quarter ounce of methamphetamine in return for his gun.

Through the spring of 1992, the Glosemeyers would "weekend" with the Williamses at their home in West Fork. During that time, according to Mr. Glosemeyer, the Williamses often traveled to California for the purpose of obtaining drugs that they would later sell in Arkansas. Mr. Glosemeyer said that the Williamses were making their living by selling drugs and collecting unemployment benefits. Mr. Glosemeyer testified that he and Ms. Glosemeyer and the Williamses would use some of the drugs the Williamses had obtained in California, but Mr. Glosemeyer stated that, in the beginning, he and his wife were not selling any drugs.

He admitted, however, that he and Ms. Glosemeyer had conversations with the Williamses about "making a living from selling drugs."

The Glosemeyers quit their jobs with the trucking company on April 17, 1992, and began living with the Williamses in their West Fork residence. Mr. Glosemeyer testified that neither he nor Ms. Glosemeyer was employed during this time or drawing unemployment benefits but that they were living on the income they already had earned. The Williamses were not charging them for rent or food. The Glosemeyers did not contribute money for the upkeep of the house, but they assisted with chores. The Williamses also provided the Glosemeyers "with as much drugs as [they] could do."

The Glosemeyers frequently talked with the Williamses about using, buying, and selling drugs. They would talk about how much methamphetamine they had in the house and how long the supply would last before Mr. Williams would have to make another trip to California to purchase more drugs. Mr. Williams made three or four trips to California for the purpose of obtaining methamphetamine during Mr. Glosemeyer's stay there from April to September 1992. Mr. Glosemeyer estimated that the Williamses would return from California with quarter pounds of methamphetamine.

Eventually, Mr. Glosemeyer did more than merely "talk" about Mr. Williams's travels to California. At some point between April and July of 1992, he permitted the Williamses to drive his truck to California for the purpose of obtaining methamphetamine. The Williamses asked the Glosemeyers to accompany them, but the Glosemeyers declined because Mr. Glosemeyer did not "think it was a good idea to take women along on a drug deal and make a party out of it." Mr. Glosemeyer testified that he permitted the use of his truck even though he was aware that the truck could have been seized if the Williamses had been caught. There is no question that Mr. Glosemeyer knew that his truck would be used by the Williamses for the purpose of purchasing drugs and bringing them back to Northwest Arkansas for distribution.

Mr. Glosemeyer said that he never saw the Williamses sell drugs in their home during his stay there from April to September of 1992, but he said that he saw people come to the house and talk with the Williamses about obtaining drugs from them. As abstracted, the testimony was, "People came to the house and we all did drugs. There was constant conversation about selling drugs." These conversations included the Williamses.

Mr. Glosemeyer testified that Ms. Glosemeyer moved out of the Williams residence in June or July of 1992 and that he moved out in September 1992. After Mr. Glosemeyer left the Williams residence, he moved to Springdale and returned to a position at McCord Trucking.

Mr. Glosemeyer testified that he continued to purchase drugs from the Williamses for his personal use. In November 1992, he began to purchase drugs from the Williamses to resell to other people. Mr. Glosemeyer testified that he purchased the drugs from Mr. Williams and sold them to a fellow truck driver from Rogers. Mr. Glosemeyer stated that the Williamses knew of Mr. Glosemeyer's arrangement and that one evening they met the Rogers truck driver who was buying the drugs that Mr. Glosemeyer was purchasing from Mr. Williams.

Mr. Glosemeyer clarified that he had not purchased drugs from Ms. Williams, but he said that she was present when he purchased the drugs from Mr. Williams and that he sometimes handed the money to Ms. Williams. Mr. Glosemeyer testified that the Williamses were receiving money from other drug buyers as well.

Mr. Glosemeyer purchased drugs from the Williamses and resold them from November 1992 to February 1993. He said that his purchases "snowballed from an eighth every day or every other day, or a couple times of week to an ounce every other day." Mr. Glosemeyer used some of the drugs himself but he increased his drug purchases because he had begun supplying a dealer in Fayetteville who "was capable of moving a lot of drugs." He would give the Fayetteville dealer a half ounce of methamphetamine twice a day. Mr. Williams also "fronted" the drugs that Mr. Glosemeyer was selling elsewhere, and Mr. Glosemeyer would

mark up the price of the drugs he had purchased from Mr. Williams or would mix it with filler or "cut" it.

Mr. Glosemeyer stated that he quit selling drugs on account of his arrest on February 22, 1993, for possession of two ounces of methamphetamine with intent to deliver. He testified that he had obtained the drugs for which he was arrested from Mr. Williams. Mr. Glosemeyer explained the events leading up to his arrest on that day as follows.

Mr. Glosemeyer was living in Rogers with Ms. Glosemeyer. A week or so prior to his arrest on February 22, 1993, Mr. Glosemeyer had permitted—for at least the second time—Mr. Williams to drive his truck to California for the purpose of obtaining drugs. Mr. Williams had told him that he was going to California in order to buy four pounds of methamphetamine. The prosecutor asked Mr. Glosemeyer why Mr. Williams had mentioned a specific amount, and Mr. Glosemeyer answered, "Because at that time I was a major distributor."

On the afternoon of February 22, Mr. Glosemeyer stopped by his wife's work place in Rogers and traded vehicles with her. He left Rogers in a Mercury owned by an acquaintance and headed for West Fork hoping to find that Mr. Williams had returned from California. Mr. Glosemeyer stated that his wife knew why he was driving to West Fork and that she knew what he was driving. Mr. Glosemeyer stated that Ms. Glosemeyer still used drugs but had "cleaned her act up very much." She notified the police that Mr. Glosemeyer was headed toward the Williamses to get drugs. He was arrested that afternoon for being in possession of two ounces of methamphetamine.

On cross-examination, Mr. Glosemeyer admitted that he was a distributor of the drugs that the Williamses were bringing back from California, but he charged that the Williamses were responsible for the "major" distribution. Mr. Glosemeyer stated that he believed the people who were participants in the various conversations about drug dealing that had occurred at the Williams residence were engaging in a conspiracy to deli ver methamphetamine. He stated that he did not know if his wife would be considered "guilty" of conspiracy, but he testified that

he "definitely" was involved in the "conspiracy." In Mr. Glosemeyer's view, the conspiracy ended with his arrest.

On redirect examination, Mr. Glosemeyer testified that, after his release from jail, he talked with Mr. Williams about the identity of the person(s) who had made the "tip" to the police leading to their arrests. The Williamses had been arrested for possession, and then for conspiracy, in the days following Mr. Glosemeyer's arrest. During one of these conversations, Mr. Williams indicated to Mr. Glosemeyer that he had asked two other individuals to sell the remainder of a shipment of methamphetamine from California that had been stashed under a bridge and that he had offered to split the money with those individuals.

The State then introduced the testimony of Terry Glosemeyer. Ms. Glosemeyer covered much of the ground covered by Mr. Glosemeyer concerning how they came to know and live with the Williamses. She stated that, after the Glosemeyers moved in with the Williamses in April 1992, they did not contribute money to the Williamses' household but did help with the cooking and cleaning. Ms. Glosemeyer verified that they all frequently used methamphetamine. She stated that Mr. Glosemeyer would take money from her paycheck and buy drugs from Mr. Williams. Ms. Glosemeyer indicated on cross-examination that she also gave money to her husband so that he could purchase drugs from Mr. Williams.

Ms. Glosemeyer testified that, while she lived at the Williams residence, she witnessed the Williamses sell drugs to other people. As she put it, "I saw methamphetamine at that house every day."

Ms. Glosemeyer recounted her role in the drug deals that occurred in the Williams house during her stay there. On one occasion, she assisted Ms. Williams by cutting some methamphetamine with Inositol and packaging it for distribution. On another occasion, Ms. Glosemeyer helped Mr. Williams prepare for one of his drug-purchasing trips to California by counting the money that Mr. Williams would use to purchase the drugs. She testified that she counted between $8000 and $10,000. She said that the money belonged to Mr. Williams and that he had

obtained it by selling drugs. When Mr. Williams returned from his trip, he had methamphetamine.

On cross-examination, Ms. Glosemeyer was asked about her drug-packaging efforts, and she said that she was "just as guilty" as Ms. Williams. She also acknowledged that she, her husband, and the Williamses were "living off of all the drug transactions that were taking place."

At the close of the State's case, counsel for Mr. Williams and counsel for Ms. Williams each moved for a directed verdict. Counsel argued that the Glosemeyers were co-conspirators and that the State's case consisted solely of their testimony. Counsel pointed out that the Glosemeyers had benefited financially from the Williamses' drug deals and that Mr. Glosemeyer had loaned his truck to Mr. Williams for his drug-purchasing trips and had described himself as a major distributor for the Williamses. More-over, counsel emphasized that Ms. Glosemeyer admitted that she cut, packaged, and helped distribute methamphetamine. Counsel stated that the Williamses could not be convicted on the testimony of co-conspirators or accomplices alone. The motion was overruled.

Counsel for Ms. Williams also argued to have Ms. Glosemeyer declared an accomplice or co-conspirator. He focused on Ms. Glosemeyer's statement—as he paraphrased it—that she was "as guilty as everybody else." The Trial Court stated that her conduct did not "rise[ ] to that level" and overruled the motion.

Our accomplice statute provides as follows:

(a) A person is an accomplice of another person in the com-mission of an offense if, with the purpose of promoting or facili-tating the commission of an offense, he:

(1) Solicits, advises, encourages, or coerces the other person to commit it; or

(2) Aids, agrees to aid, or attempts to aid the other per-son in planning or committing it; or

(3) Having a legal duty to prevent the commission of the offense, fails to make proper effort to do so.

(b) When causing a particular result is an element of an offense, a person is an accomplice in the commission of that offense if, acting with respect to that result with the kind of culpability sufficient for the commission of the offense, he:

(1) Solicits, advises, encourages, or coerces the other person to engage in the conduct causing the result; or

(2) Aids, agrees to aid, or attempts to aid the other person in planning or engaging in the conduct causing the result; or

(3) Having a legal duty to prevent the conduct causing the result, fails to make proper effort to do so.

Ark. Code Ann. § 5-2-403 (Repl. 1993).

According to Ark. Code Ann. § 5-64-401 (Repl. 1993), "it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver a controlled substance." The terms "deliver" and "delivery" mean "the actual, constructive, or attempted transfer from one (1) person to another of a controlled substance or counterfeit substance in exchange for money or anything of value, whether or not there is an agency relationship." § 5-64-101(f).

The conspiracy statute, § 5-4-203, provides as follows:

A person conspires to commit an offense if with the purpose of promoting or facilitating the commission of any criminal offense:
(1) He agrees with another person or other persons:

(A) That one (1) or more of them will engage in conduct that constitutes that offense; or

(B) That he will aid in the planning or commission of that criminal offense; and
(2) He or another person with whom he conspires does any overt act in pursuance of the conspiracy.

"The defendant in a criminal case has the burden of proof that a witness is an accomplice whose testimony must therefore be corroborated." *Cate v. State,* 270 Ark. 972, 976, 606 S.W.2d 764, 766 (1980). *See King v. State,* 323 Ark. 671, 916 S.W.2d 732 (1996); *Cole v. State,* 323 Ark. 8, 913 S.W.2d 255 (1996); *Vickers v. State,* 313 Ark. 64, 852 S.W.2d 787 (1993). "Whether a wit-

ness is an accomplice is usually a mixed question of fact and law, and the finding of a jury as to whether a witness is an accomplice is binding unless the evidence shows *conclusively* that the witness was an accomplice." *Cate v. State, supra* (emphasis added). *See Pilcher v. State,* 303 Ark. 335, 796 S.W.2d 845 (1990); *Lear v. State,* 278 Ark. 70, 643 S.W.2d 550 (1982); *Wilson & Dancy v. State,* 261 Ark. 820, 552 S.W.2d 223 (1977). *See also Marshall v. State,* 27 Ark. App. 287, 289, 770 S.W.2d 177, 178 (1989)("[W]here there is *no conflict in the evidence* as to a witness's participation in a crime, *or where his participation therein is conceded,* the question whether the witness is an accomplice is one of law for the trial judge to determine.")(Emphasis added.)

■ The testimony of the Glosemeyers "shows conclusively" that—in the words of the accomplice statute—they aided, agreed to aid, or attempted to aid the Williamses in planning or committing (1) the offense of conspiracy to deli ver methamphetamine and (2) the offense of delivery. It is clear that the Glosemeyers so acted "with the purpose of promoting or facilitating the commission of" the offenses. § 5-2-403(a)(2). The Glosemeyers very well could have been charged as co-conspirators under the conspiracy statute. There is no question that they, acting "with the purpose of promoting or facilitating the commission" of delivery of methamphetamine, agreed with the Williamses (1) that one or more of them would engage in conduct that constitutes delivery of methamphetamine, or (2) that the Glosemeyers would "aid in the planning or commission" of that offense, and there is no question that the Williamses and the Glosemeyers committed several "overt acts" in pursuance of the conspiracy.

In view of the fact that the only evidence against the Williamses came from accomplices, the question becomes whether there was any evidence to corroborate their testimony. We find none. During oral argument of this case counsel for the State was asked if there were any such evidence, and he agreed there was none.

■ There being no corroborating evidence, the proper disposition of the case must be determined. In other instances in

which the only evidence was given by an accomplice or by accomplices, we have found the evidence insufficient and ordered dismissal rather than remand for a new trial. *Foster v. State,* 290 Ark. 495, 720 S.W.2d 712 (1986); *Pollard v. State,* 264 Ark. 753, 574 S.W.2d 656 (1978). *See also Strickland v. State,* 16 Ark. App. 293, 701 S.W.2d 127 (1995).

■ In the *Foster* case, where we reversed and dismissed a first-degree murder conviction, the State argued in its petition for rehearing that the case should have been remanded for a new trial. We disagreed and persisted in our characterization of the situation as one in which the State's evidence had been insufficient for conviction, thus requiring dismissal. We said:

> . . . if under our law an accused must be acquitted if the state's case is based on the uncorroborated testimony of an accomplice, then that determination on appeal prohibits retrial just as it does when acquittal occurs at the trial. The reason for reversal is not "error" but insufficiency of the state's proof.

*Foster v. State,* 290 Ark. at 498-B, 722 S.W.2d at 871 (Supplemental Opinion on Denial of Rehearing). We concluded there, as we conclude here, that the retrial of a defendant in these circumstances would result in him or her being placed twice in jeopardy of being convicted of a crime.

Reversed and dismissed.

GLAZE and BROWN, JJ., concur.

ROBERT L. BROWN, Justice, concurring. I concur in this opinion but write to emphasize that I would not consider the abstract in this case to be flagrantly deficient under Supreme Court Rule 4-2 merely because the judgment and commitment order for Houston Williams was erroneously described. Furthermore, even if the judgment and commitment order had not been abstracted, I would not consider the abstract to be fatal to this appeal.

The abstract in the Houston Williams brief contains the jury verdict and the sentencing by the trial court. Neither the judgment nor sentence is at issue in this appeal. This situation is unlike the civil cases cited by the majority where the judgment or order appealed from was essential to what the trial court had found,

concluded, and ordered. *See Jewell v. Miller County Election Comm'n*, 327 Ark. 153, 936 S.W.2d 754 (1997); *Winters v. Elders*, 324 Ark. 246, 920 S.W.2d 833 (1996); *Jolly v. Hartje*, 294 Ark. 16, 740 S.W.2d 143 (1987).

To be sure, an abstracted judgment or order can be essential in a criminal appeal. We have affirmed for lack of material evidence when the issue was revocation of a probationary sentence for battery and where the underlying conviction was not abstracted. *See Wallace v. State*, 326 Ark. 376, 931 S.W.2d 113 (1996). We have also affirmed where the criminal appellant merely listed titles of pleadings and relevant evidence. *See, e.g., King v. State*, 325 Ark. 313, 925 S.W.2d 159 (1996); *Harrison v. State*, 300 Ark. 439, 779 S.W.2d 536 (1989). We have also affirmed under Supreme Court Rule 4-2 where the abstract in the criminal case failed to include "testimony, arguments, rulings, instructions, jury's findings, or the judgment of conviction." *Moore v. State*, 325 Ark. 468, 929 S.W.2d 149 (1996). Also, in a case involving the issue of jury selection under *Batson v. Kentucky*, 476 U.S. 79 (1986), we affirmed under Rule 4-2 when the information, judgment and commitment order, notice of appeal, and information about the composition of the *venire*, the final jury panel, and defendant's use of peremptory challenges were all omitted. *See Mayo v. State*, 324 Ark. 328, 920 S.W.2d 843 (1996). We have also affirmed in cases collaterally attacking a judgment of conviction where neither the petition nor trial court order was abstracted. *See, e.g., Jackson v. State*, 316 Ark. 509, 872 S.W.2d 400 (1994) (per curiam); *Wilson v. State*, 306 Ark. 179, 810 S.W.2d 337 (1991).

Nevertheless, we have not gone so far as to affirm under Rule 4-2 where the absence of the judgment and commitment order form is the sole deficiency, where that judgment is not at issue in the appeal, and where the conviction and sentence can be gleaned from other parts of the abstract. I disagree with any suggestion that we might do so in future appeals, and for that reason I concur.

GLAZE, J., joins.